LEVIN H. CAMPBELL, Chief Judge.
 

 In 1974, Good Hope Chemical Corporation (“Good Hope”), a Texas corporation and the Chapter XI debtor, contracted with Koerver & Lersch (“K & L”), a West German manufacturer of specially fabricated equipment, to construct two sets of heat exchangers for use in an ammonia plant Good Hope was to build in Ingleside, Texas. The contract was formed by a series of telexes between Good Hope’s purchasing agent, M.W. Kellogg Co. (“Kellogg”), and K & L in West Germany. The first telex, from Kellogg to K & L, advised K & L to “enter good hope chemical purchase orders” and quoted a purchase price in dollars. K & L’s reply telex, however, stated:
 

 we confirm to have booked your order for the supply of heat exchangers strictly in accordance with your telex ... with the following exception: all prices in the purchase order to be in german marks as follows: [list of figures omitted] two plants have been ordered at a total price of 13.046.540, — german marks. If the purchase order is made out in dollars, it will not be accepted ....
 

 the dollar prices in your purchase order have been worked out at a rate of one german mark equal to 0,394 dollars and have been used for comparison reason only.
 

 According to K & L, it was unwilling to enter into the contract unless it provided for payment of a fixed number of marks because K & L expected to, and did, incur all costs of the contract in German marks, and because K & L’s offices were in Germany, it had no investments outside of Germany, and it was unwilling to shoulder the risk of foreign exchange fluctuations. Subsequent communications and purchase order modifications reflected the understanding that K & L would receive a fixed number of German marks for the heat exchangers.
 

 The parties arranged for Good Hope to pay K & L in three installments: 30 percent 90 days after placement of the order, 30 percent 180 days after placement of the order, and the balance on shipment of the exchangers to Good Hope, F.A.S., a German or Dutch port. Good Hope was to notify its bank of the amount of marks owed K & L. Good Hope’s American bank would then arrange a date for exchange with K & L’s German bank. On that date, Good Hope’s bank would wire marks to the German bank, which would credit K & L’s account with that number of marks. Good Hope’s bank would debit Good Hope’s account by the number of dollars needed to buy the marks. Thus, Good Hope would not know the actual dollar cost to it of the heat exchangers until it had paid for them.
 

 Good Hope never made any payments under the contract. On October 31, 1975, after K & L had substantially completed the exchangers but before it shipped them, Good Hope filed a voluntary petition for reorganization under Chapter XI of the Bankruptcy Act. K. & L filed its proofs of claims
 
 [1]
 
 in December 1975.
 

 The attempts at reorganization failed, and when it became clear that the partially completed ammonia plant and the equipment intended for use in the plant could not be sold as a package to a third party, the creditors’ committee, which included K
 
 *808
 
 & L, moved that the creditors be relieved of their contracts with Good Hope so that they could take other steps to mitigate their damages. Good Hope opposed the motion and the United States Bankruptcy Court for the District of Massachusetts denied it on June 8, 1978 on the grounds that there was no showing that the contracts were burdensome to the estate and no showing that rejection would benefit the estate.
 

 Some time later, K & L arranged to sell the equipment it had made for Good Hope to Petróleos Mexicanos (“Pemex”) at a deep discount. Good Hope opposed the sale and sought an injunction; the injunction was denied and the sale went through.
 

 On June 12, 1980, in accordance with a stipulation agreed to by Good Hope, K & L, and the creditors’ committee, the bankruptcy court allowed K & L’s claim in the total amount of the United States dollar equivalent of DM 11,055,121 for damages for the rejected executory contract.
 
 [2]
 
 This figure represents the final contract price minus the net proceeds K & L realized from the resale to Pemex.
 

 After a hearing on January 20, 1988, the bankruptcy judge rejected Good Hope’s creditors’ committee’s
 
 [3]
 
 argument that the appropriate date for determining the exchange rate is the date of the contract breach, which it asserted to be October 31, 1975.
 
 [4]
 
 Instead, the court adopted K & L’s suggestion that the exchange rate on the date of judgment — June 12, 1980
 
 [5]
 
 — should govern the computation of the judgment amount.
 

 The consequence of choosing the exchange rate prevailing on the judgment date, as opposed to the breach date as declared by the committee, is a substantially larger dollar judgment.
 

 K
 
 &
 
 L will not, of course, receive the full amount of the debt owed it but will receive, like the other unsecured creditors, a dividend based upon K & L’s fraction of the total unsecured debt owed by Good Hope. Thus, the lower the dollar amount of K
 
 &
 
 L’s claim, the lower will be K & L’s percentage of the unsecured debt relative to the other claimants. The lower K & L’s percentage is, the higher the dividends of the other creditors will be. Thus, the creditors’ committee has appealed from both the
 
 *809
 
 bankruptcy court’s determination that the contract price was payable in German marks and the court’s use of the exchange rate in effect on June 12,1980. The United States District Court for the District of Massachusetts affirmed the exchange rate selected by the bankruptcy court. The creditors’ committee now appeals to this court.
 

 I.
 

 The creditors’ committee first argues that the contract’s reference to marks served only to adjust the amount of dollars payable; dollars, they contend, were to be the medium of payment under the contract. The facts, however, indicate that the reverse is true.
 

 Telex communications between the parties make it clear that K & L contracted to receive German marks as payment for the heat exchangers that it was constructing. The district court found,
 

 With respect to place and medium of payment in the case at bar, there is no doubt that Good Hope’s obligation was to deliver marks to K & L in Germany. Good Hope argues that it contracted to pay K & L in dollars. That view of the matter just does not fit with the facts. It is true that Good Hope had to pay dollars to its bank to buy marks. However, K & L was to
 
 receive
 
 marks: payment was to be in marks. The telexes and all subsequent purchase order modifications fixed K & L’s price in marks. Good Hope would not know its cost, nor would it have fulfilled its payment obligation to K & L, until K & L received marks in its German bank account. The contract between Good Hope and K & L clearly called for payment “in foreign currency in a foreign country.”
 
 Gutor [International AG v. Raymond Packer Co.,
 
 493 F.2d 938,] 943.
 

 The record below amply supports the lower court’s characterization. Of particular note is the counteroffer from K & L reading, “if the purchase order is made out in dollars, it will not be accepted .... the dollar prices shown in your purchase order have been worked out at a rate of one German mark equal to 0.394 dollars
 
 and have been used for comparison reason only.”
 
 (Emphasis supplied.) We disagree with the creditors’ committee’s contention that the bankruptcy court and the district court erred in finding that Good Hope was obligated to deliver marks to K & L.
 

 II.
 

 A harder question is what date determines the exchange rate for converting damages, computed in marks, into a dollar judgment.
 
 See Frontera Transportation Co. v. Abaunza,
 
 271 F. 199 (5th Cir.1921); Note,
 
 Conversion Date of Foreign Money Obligation,
 
 65 Colum.L.Rev. 490 (1965) (“It is a settled principle of Anglo-American law that judgments for money damages must be rendered in the currency of the forum.”) (footnote omitted).
 

 The parties, as well as the bankruptcy court and the district court, agree that the question of what date’s exchange rate controls turns on the interpretation of two Supreme Court cases,
 
 Hicks v. Guinness,
 
 269 U.S. 71, 46 S.Ct. 46, 70 L.Ed. 168 (1925), and
 
 Deutsche Bank Filiale Nurnberg v. Humphrey,
 
 272 U.S. 517, 47 S.Ct. 166, 71 L.Ed. 383 (1926).
 

 In
 
 Hicks,
 
 a German firm owed a debt to an American company. Although the debt was to be paid in America, the obligation was stated in German marks. The Court, employing what became known as the breach day rule, held that the American company had a claim for dollars as of the date the contract was breached and thus the conversion rate prevailing on that date should apply:
 

 The debt was due to an American creditor and was to be paid in the United States. When the contract was broken by a failure to pay, the American firm had a claim here, not for the debt, but, at its option, for damages in dollars. It no longer could be compelled to accept marks. It had a right to say to the debtors “You are too late to perform what you promised, and we want the dollars to which we have a right by the
 
 *810
 
 law here in force.... The event has come to pass upon which your liability becomes absolute as fixed by law.” ... The loss for which the plaintiff is entitled to be indemnified is “the loss of what the contractor would have had if the contract had been performed,” ... it happens at the moment when the contract is broken, just as it does when a tort is committed, and the plaintiffs claim is for the amount of that loss valued in money at that time.
 

 Hicks,
 
 269 U.S. at 80, 46 S.Ct. at 47.
 

 By contrast, the Court one year later in
 
 Deutsche Bank
 
 used what has been la-belled the judgment day rule. In
 
 Deutsche Bank,
 
 a German bank refused to return marks on deposit when the American depositor demanded them. The money was held by the Alien Property Custodian after World War I and the depositor sued in the United States under the Trading with the Enemy Act to recover his money. The Court held that the amount owed should be converted at the rate in effect on the date of judgment, stating:
 

 In this case, unlike
 
 Hicks v. Guinness,
 
 269 U.S. 71, [46 S.Ct. 46, 70 L.Ed. 168] at the date of the demand the German Bank owed no duty to the plaintiff under our law. It was not subject to our jurisdiction and the only liability that it incurred by its failure to pay was that which the German law might impose.... A suit in this country is based upon an obligation existing under the foreign law at the time when the suit is brought, and the obligation is not enlarged by the fact that the creditor happens to be able to catch his debtor here_ We may assume that when the Bank failed to pay on demand its liability was fixed at a certain number of marks both by the terms of the contract and by the German law — but we also assume that it was fixed in marks only, not at the extrinsic value that those marks then had in commodities or in the currency of another country. On the contrary, we repeat, it was and continued to be a liability in marks alone and was open to satisfaction by the payment of that number of marks, at any time, with whatever interest might have accrued, however much the mark might have fallen in value as compared with other things_ An obligation in terms of the currency of a country takes the risk of currency fluctuations and whether the creditor or debtor profits by the change the law takes no account of it.... Obviously, in fact a dollar or a mark may have different values at different times but to the law that establishes it it is always the same. If the debt had been due here and the value of dollars had dropped before suit was brought the plaintiff could recover no more dollars on that account. A foreign debtor should be no worse off.
 

 Deutsche Bank,
 
 272 U.S. at 518-19, 47 S.Ct. at 166 (citations omitted).
 

 As the district court correctly noted, courts and commentators have drawn from
 
 Hicks
 
 and
 
 Deutsche Bank
 
 disparate formulas for determining when to apply the judgment or breach day rules. Two principal approaches have emerged. The first is a rather mechanical approach that focuses on the place of payment. It requires that the judgment day rule apply when the contractual obligation is payable in a foreign country in that country’s currency, and the breach day rule apply when the payment is to be made in the United States. The district court questioned this formula. It indicated that it would have rejected it were it not for this court’s decision in
 
 Gutor International AG v. Raymond Packer Co.,
 
 498 F.2d 938, 943 (1st Cir.1974). But the court read
 
 Gutor
 
 as requiring it to follow the above rule. While we understand the court’s quandry, we do not believe that
 
 Gutor
 
 mandates such an approach. In
 
 Gutor
 
 we merely acquiesced in a formulation advanced by one side without effective opposition from the other.
 
 [6]
 
 The issue was never litigated.
 

 
 *811
 
 Now that the issue is squarely before us, we agree with the district court that a second approach, while more complex, conforms better with the Court’s language in
 
 Hicks
 
 and
 
 Deutsche Bank
 
 and the weight of authority. This approach looks to the jurisdiction in which the plaintiffs cause of action arose to determine which rule is applicable. The judgment day rule applies only when the obligation arises entirely under foreign law. If, however, at the time of breach the plaintiff has a cause of action arising in this country under American law, the breach day rule applies.
 

 The second approach follows logically from the language of both
 
 Hicks
 
 and
 
 Deutsche Bank.
 
 Thus the Court said in
 
 Hicks,
 

 When the contract was broken by a failure to pay, the American firm had a claim
 
 here,
 
 not for the debt, but, at its option, for damages in dollars.
 

 269 U.S. at 80, 46 S.Ct. at 47 (emphasis added).
 

 This language contrasts with that in
 
 Deutsche Bank,
 
 where the Court said,
 

 In this case, unlike
 
 Hicks
 
 ..., at the date of the demand the German Bank owed no duty to the plaintiff
 
 under our lavx
 
 It was not subject to our jurisdiction and the only liability it incurred by its failure to pay was that which German law might impose.... Here we are lending our Courts to enforce an obligation (as we should put it, to pay damages,) arising from German law alone and ought to enforce no greater obligation than exists' by that law at the moment when the suit is brought.
 

 272 U.S. at 518-20, 47 S.Ct. at 166-67 (emphasis added).
 

 The weight of authority endorses our reading of
 
 Hicks
 
 and
 
 Deutsche Bank. See, e.g., Zimmerman v. Sutherland,
 
 274 U.S. 253, 256, 47 S.Ct. 625, 626, 71 L.Ed. 1034 (1927) (“The distinction between the
 
 Deutsche Bank
 
 case and
 
 Hicks v. Guinness,
 
 269 U.S. 71, 46 S.Ct. 46, 70 L.Ed. 168 is not, as argued, that the plaintiff in
 
 Hicks v. Guinness
 
 was in the United States, but that, as the Court understood the facts, the debt was payable in New York and
 
 subject to American law,
 
 so that upon a breach of the contract
 
 there arose a present liability in dollars.’’)
 
 (emphasis added);
 
 Jamaica Nutrition Holdings v. United Shipping Co.,
 
 643 F.2d 376, 380 (5th Cir.1981);
 
 Conte v. Flota Mercante Del Estado,
 
 277 F.2d 664, 670 (2d Cir.1960) (“when an obligation is governed by foreign law, the conversion from the foreign currency into dollars is made at the rate of exchange prevailing at judgment”);
 
 Reissner v. Rogers,
 
 276 F.2d 506, 510 (D.C.Cir.),
 
 cert. denied,
 
 364 U.S. 816, 81 S.Ct. 47, 5 L.Ed.2d 47 (1960);
 
 The Gylfe v. The Trujillo,
 
 209 F.2d 386, 387 (2d Cir.1954);
 
 Paris v. Central Chiclera,
 
 193 F.2d 960, 963 (5th Cir.1952) (Rives, J., dissenting);
 
 Shaw, Savill, Albion & Co. v. The Fredericksburg,
 
 189 F.2d 952, 955 (2d Cir.1951) (“This court has held that the so-called judgment-day rule applies to the unliquidated damages where the cause of
 
 *812
 
 action was of foreign origin.”);
 
 Restatement (Second) of Conflicts of Laws
 
 § 144 (1971) (Time for Converting Foreign Currency Into Local Currency) (“When in a suit for the recovery of money damages the cause of action is governed by the local law of another state, the forum will convert the currency in which recovery would have been granted in the other state into local currency as of the date of the award”); Note,
 
 Dollar Damages to Foreign Plaintiffs: Conversion and Revaluation of Foreign Currencies,
 
 61 Yale L.J. 758, 759 (1952) (federal courts “employ the breach date only for causes of action ‘arising’ in the United States. If the cause of action ‘arises’ elsewhere, they generally adopt the judgment-date, converting the foreign currency loss at the exchange rate of that day”) (footnotes omitted);
 
 cf. Cronel Watch, S.A. v. Peterson State Bank,
 
 565 F.Supp. 259, 262 & n. 3 (N.D.Ill.1983) (applying mechanical variant of second approach: judgment day rule controls where foreign breach while breach day rule applies to a domestic breach);
 
 B.V. Bureau Wijsmuller v. United States,
 
 487 F.Supp. 156, 177 (S.D.N.Y.1979) (same); Note,
 
 Fluctuating Rates of Exchange and the Conflict of Laws,
 
 40 Harv.L.Rev. 619 (1926-27) (application of judgment or breach day rules depends on place where breach occurred because that is where right of action is created).
 

 In this case, the bankruptcy court and the parties were in agreement that Good Hope’s cause of action arose under American law. The “choice of law” approach mandates, therefore, that the rate of exchange in effect on the breach date prevail.
 

 III.
 

 Our decision to apply the breach date does not, however, end the matter. Given Good Hope’s bankruptcy, it is not obvious what date constitutes the date of breach. The district court believed that section 63(c), 11 U.S.C. § 103(c) (1976), required that the actual date of breach — assumed to be the date upon which the contract was rejected, May 9, 1980
 
 [7]
 
 — relates back to the date the petition was filed on October 31, 1975. K & L argues that the relation back rule’s rationale in bankruptcy has no applicability in this context. It also asserts that any “fictional” breach of the contract on October 31, 1975, did not give rise to an obligation enforceable against Good Hope on that date, and thus October 31, 1975 cannot be the determinative date under
 
 Hicks. See Hicks,
 
 269 U.S. at 80, 46 S.Ct. at 47 (upon breach “[t]he event has come to pass upon which your liability becomes absolute as fixed by law”).
 
 See also Zimmerman,
 
 274 U.S. at 256, 47 S.Ct. at 626 (upon breach, “there arose a present liability in dollars”). Assumedly, they are contending that the date upon which Good Hope’s liability became definite was (and thus the breach date should be) the date the contract was actually and finally rejected, May 9, 1980.
 

 We find merit in K & L’s contention. The
 
 Hicks
 
 Court believed that the fixation of liability is important because the plaintiff’s loss, its expectancy from the contract, “happens when the contract is broken ... and the plaintiff’s claim is for the amount of loss valued in money at that time.” Here the breach was complete, and the compensable loss incurred, only when the contract was rejected on May 9, 1980, not before. In this case, the relation back rule would disrupt the
 
 Hicks
 
 Court’s attempt to give the plaintiff his expectancy as of the date his loss became definite.
 
 [8]
 
 The rela
 
 *813
 
 tion back rule is necessary in bankruptcy because without it a Chapter XI debtor would be required to reject an executory contract immediately upon filing or have its obligation for damages upon rejection during the bankruptcy case treated as an administrative expense entitled to priority under section 64(a)(1), 11 U.S.C. § 104(a)(1) (1976). This rationale for the operation of section 63(c) has no applicability to the conversion rate issue. We recognize that the creditors’ committee petitioned in 1975 to have the K & L contracts rejected, and they argue that they should not be made to suffer because of subsequent currency fluctuations. But we think that K & L is entitled to the conversion rate in effect when the contract was actually broken.
 

 We hold therefore that the actual breach date — the date upon which the contract was rejected, May 9, 1980 — is controlling. The rate of conversion prevailing on that date should be applied to the damages estimation to yield the dollar judgment amount.
 

 The judgment of the district court is vacated and the matter is remanded for revaluation of K & L’s claim in accordance with the exchange rate in effect on May 9, 1980.
 

 So ordered.
 

 [1]
 

 . K
 
 & L
 
 filed a separate proof of claim for each heat exchanger, but the claim finally allowed in German marks, DM 11,055,121, reflects the total amount due K & L, less the proceeds K & L realized from its resale of the equipment to Petróleos Mexicanos.
 
 See infra.
 

 [2]
 

 . The parties expressly left open the question of what day’s exchange rate should apply for purposes of converting the claim in marks into a judgment in dollars.
 

 [3]
 

 . As the bankruptcy judge explained in his order on the exchange rate issue:
 

 Concerned with the exchange rate issue is the creditors' committee, rather than the debtor. This is because the plan of [Good Hope], confirmed on May 9, 1980, is a "pot plan” so that my decision affects the amount other creditors of [Good Hope] will receive and does not require (Good Hope] to supply additional money to fund the plan.
 

 [4]
 

 . October 31, 1975 was actually the date of the filing of the petition in bankruptcy. In the committee’s view this was also the breach date, since under section 63(c) of the Bankruptcy Act, rejection of an executory contract operates as a breach of the contract and relates back to the date of the filing of the petition.
 

 [5]
 

 . June 12, 1980 was the date the court allowed K & L’s claim. The bankruptcy court's allowance of a creditor’s claim has the effect of a final judgment on the merits in a Chapter XI proceeding.
 
 See, e.g., Walter E. Heller & Co. v. Cox,
 
 343 F.Supp. 519, 524 (S.D.N.Y.1972),
 
 aff'd,
 
 486 F.2d 1398 (2d Cir.),
 
 cert. denied,
 
 414 U.S. 827, 94 S.Ct. 46, 38 L.Ed.2d 61 (1973).
 

 [6]
 

 . In
 
 Gutor,
 
 this court applied the judgment day rule to a Swiss seller’s breach of contract recovery against an American buyer, even though the claim arose under Massachusetts law. The exchange rate issue, however, was not squarely presented due to the
 
 Gutor
 
 defendant’s failure
 
 *811
 
 to raise, and submit proof on, this issue at the district court level. The language of the opinion makes clear that this court did not address the issue on the merits, but rather adopted the plaintiff’s position by default:
 

 Gutor in its complaint requested recovery "in the amount of sFr. 16T625.00, or the equivalent therefor in United States dollars computed at the official exchange rate existing on the date of judgment_" Packer [the defendant] did not contest the price and terms. If Packer believed that damages should be computed as of some date prior to the date of judgment, it should have made the point before or at the hearing on the motion for summary judgment. After judgment, if it wished to pursue the matter, Packer should have timely moved to alter or amend the judgment under Rule 59(e).
 

 Gutor relies on the rule that when a debt is payable in foreign currency in a foreign country the proper date of conversion is the judgment or payment date and not the date on which the obligation arose.... The record is consistent with Gutor’s assertions and the court’s ruling. To the extent Packer was without later opportunity to persuade the court that payment was to be in the United States, thus possibly giving rise to a different rule, the fault was its own. We affirm the district court's judgment on Gutor’s claim.
 

 Gutor,
 
 493 F.2d at 943-44 (footnotes and citations omitted).
 

 [7]
 

 . The Act provides that a Plan of Arrangement may include "provisions for the rejection of any executory contract.” Bankruptcy Act § 357(2), 11 U.S.C. § 757(2) (1976). Chemical's Plan provided that all executory contracts would be rejected as of confirmation on May 9, 1980.
 

 [8]
 

 . The object of the breach day rule is to restore the plaintiff to the position he would have enjoyed had the contract not been breached.
 
 See Hicks,
 
 269 U.S. at 80, 46 S.Ct. at 47 ("The loss for which the plaintiff is entitled to be indemnified is ‘the loss of what the contractor would have had if the contract had been performed’”); Note,
 
 Conversion Date of Foreign Money Obligations,
 
 65 Colum.L.Rev. 490, 493 (1965). The breach day rule, however, may fail to fully compensate plaintiffs like K & L who would
 
 *813
 
 have retained the foreign currency, which appreciated in value relative to the dollar, had the agreement been performed. To put K & L as nearly as possible in the position it would have enjoyed had the contract not been breached, we would have to use the judgment day rate of exchange, a result not reconcilable with our reading of Supreme Court precedent.
 

 We recognize that more flexibility in determining the "breach date” for the purpose of awarding full compensation in cases like this,
 
 i.e.,
 
 permitting a court to use the judgment day rate of exchange in order to give the plaintiff its full measure of expectancy damages, might be desirable. But we also believe that because this is a rule governing commercial transactions, the parties’ interest in a clearly defined rule, which affords them some degree of certainty, should be weighted heavily. Thus, we believe that the “breach date" selected should indeed be the date at which the contract is broken and the loss incurred, rather than some other date that gives plaintiffs like K & L the fullest possible recovery.