[No. A037062. First Dist., Div. Two. Feb. 2, 1988.]

PECAFLOR CONSTRUCTION, INC., et al., Plaintiffs and Appellants, v.
NAT LANDES, Defendant and Respondent.

**COUNSEL**

Richard E. Levine and Fenwick, Davis & West for Plaintiffs and Appellants.

Robert O. Wilhelm and Wilhelm, Thompson, Wentholt & Gibbs for Defendant and Respondent.

## OPINION

**SMITH, J.**—The issue in this case is whether a California judgment enforcing a foreign judgment is fully satisfied by paying off the foreign judgment in foreign currency, where there has been an intervening fall in the value of the foreign currency as against the American dollar. We hold that satisfying the foreign judgment satisfies the California judgment as well.

### BACKGROUND

The full history of this litigation is not discernible from the record, but the parties agree on the material facts and events. Pecaflor Construction, Inc. (Pecaflor) and Temuco Construction, Inc. (Temuco) each sued Nat Landes (Landes) and others in Canada for breach of a contract to develop and build a golf course near the City of Calgary in Alberta, Canada. The contract was between Canadian entities, was executed and to be performed in Canada, called for payment in Canadian dollars, and was to be governed by Canadian law. Pecaflor and Temuco sued over alleged nonpayment for work performed. Landes, sued as an individual, was a construction manager for the project.

Negotiations led to consent judgments entered in the Canadian court, the Court of Queen's Bench of Alberta in the Judicial District of Calgary (action Nos. 8201-08305 and 8201-08308), on November 8, 1982. Those judgments, expressed in Canadian dollars, totaled $162,375.32—$121,544.27 to Pecaflor and $40,831.05 to Temuco—with 18 percent annual interest accruing after October 26 of that year on the unpaid balance. Landes was one of several defendants bound by the judgments.

Pecaflor and Temuco had the judgments established against Landes in the superior court below, under the Uniform Foreign Money-Judgments Recognition Act (Code Civ. Proc., § 1713 et seq.). Landes unsuccessfully defended the action, apparently on grounds that the judgment was obtained by fraud, and simultaneously sought appellate relief from the Canadian judgment in Canada.

The superior court entered judgment against Landes on January 13, 1986, for a total of $209,755.34 in American dollars, representing the judgment plus the stipulated 18 percent annual interest. In converting to our currency (before calculating interest), the court used the exchange rate in effect at the time of the Canadian judgment.

Landes subsequently satisfied the Canadian judgments in Canada with Canadian dollars. In April, he obtained a stay of the Canadian proceedings

and deposited principal, costs and interest in trust as a condition for leave from the Canadian court to appeal the judgments. Finally abandoning his appeal efforts, he ordered all trust funds released and, with consent from Pecaflor and Temuco, received orders of satisfaction of judgment on August 14, 1986.

Landes then moved the California court to compel acknowledgment of full satisfaction of the California judgment (Code Civ. Proc., § 724.050) based on satisfaction of the Canadian judgments. Pecaflor and Temuco opposed the motion. They argued, based on the Canadian dollar's fallen value relative to the American dollar in the time between the November 1982 Canadian judgments and the August 1986 satisfactions, that Landes's payment in Canadian dollars was in effect deficient by $18,345.30 in American dollars.[1]

The motion was granted after a hearing, and Pecaflor and Temuco timely appeal from a subsequent order directing the superior court clerk to enter satisfaction in full. The order is appealable as an order made after judgment. (Code Civ. Proc., § 904.1, subd. (b); *Yanchor* v. *Kagan* (1971) 22 Cal.App.3d 544, 546 [99 Cal.Rptr. 367].)

## APPEAL

■ Should California courts account for intervening fluctuation in the value of a foreign currency relative to our own when enforcing a foreign judgment rendered in the foreign currency? For reasons which follow we think the answer is "No."

■ We find no California authority on the precise problem presented here—the effect of post-foreign-judgment currency fluctuations on an enforcement action brought in California. However, we do find authority in an analogous situation, where currency fluctuations affect the value of a cause of action arising in a foreign country but litigated and first reduced to judgment in California. The analogy is apt because both situations concern whether and to what extent a California court will, as a matter of policy, protect the real value of the foreign obligation.

The problem in both instances is in selecting a conversion date for the foreign currency. In cases brought to trial in this state, the question

---

[1] The claimed deficiency arises, according to the opposition papers, because Landes's payments in Canadian dollars, "when converted at the exchange rate on the date of payment, amounted to $137,145.16 (U.S.) and $54,264.88 (U.S.)," or, $18,345.30 short of the California court's judgment of $209,755.34. The record does not reveal the rate of exchange used or the subsidiary calculations, but the amount is not disputed.

ordinarily is whether to apply the breach-day rule, which calls for the currency exchange rate in effect at the time the obligation arose, or the judgment-day rule, which calls for the exchange rate in effect at the time of the later judgment.[2] (See Note, *The Need to Retreat From Inflexible Conversion Rules—An Equitable Approach to Judgment in Foreign Currency* (1982) 22 Santa Clara L. Rev. 871, 873-883 (hereafter *Judgment in Foreign Currency*).

California cases, though few in number, are generally consistent with federal Supreme Court precedent that makes the choice of the breach-day or judgment-day rule depend on the jurisdiction in which the plaintiff's cause of action (or the defendant's obligation) arose. "If the obligation arose entirely under foreign law, the judgment-day rule applies; damages incurred in foreign currency are converted into dollars at the rate prevailing on the date of final judgment. On the other hand, if the plaintiff has a cause of action under American law, the breach-day rule applies, and the applicable rate is that prevailing when the cause of action arose. [Citations.]" (*Levi Strauss & Co.* v. *Aetna Casualty & Surety Co.* (1986) 184 Cal.App.3d 1479, 1487 [229 Cal.Rptr. 434] (*Levi Strauss*); *In re Good Hope Chemical Corp.* (1st Cir. 1984) 747 F.2d 806, 810-812.) In *Levi Strauss,* for example, the breach-day rule was applied to an action on an insurance contract providing for indemnity in Argentine pesos, where the contract was breached under California law. (*Levi Strauss, supra,* 184 Cal.App.3d at pp. 1481-1482, 1486-1487.)

The federal rule is synthesized from two high court decisions authored by Justice Holmes, both of which involved contract obligations owed in German marks that had declined against the dollar by the time of judgment in this country. In *Hicks* v. *Guinness* (1925) 269 U.S. 71 [70 L.Ed. 168, 46 S.Ct. 46], the court applied the breach-day rule where a German firm owed an American firm a debt payable in this country in marks, reasoning: "The debt was due to an American creditor and was to be paid in the United States. When the contract was broken by a failure to pay, the American firm had a claim here, not for the debt, but, at its option, for damages in dollars. It no longer could be compelled to accept marks." (*Id.,* at p. 80 [70 L.Ed. at p. 171].)

Then, in *Deutsche Bank* v. *Humphrey* (1926) 272 U.S. 517 [71 L.Ed. 383, 47 S.Ct. 166] (*Deutsche Bank*), a majority found the judgment-day rule

---

[2] Two theoretical alternatives are to give judgment in the foreign currency or to use the exchange rate in effect when the obligation is actually paid. However, payment in foreign currency runs counter to the historic notion (rooted in common law and a former federal statute) that American judgments must be paid in American dollars, and the payment-date rule may offend the principle that a judgment must be for a sum certain. (*Competex, S.A.* v. *LaBow* (2d Cir. 1986) 783 F.2d 333, 337-338.)

applicable where a German bank's debt (in marks) was to be paid to an American in Germany and according to German law. Justice Holmes wrote: "[The debt] was fixed in marks only, not at the extrinsic value that those marks then had in commodities or in the currency of another country. On the contrary, . . . it was and continued to be a liability in marks alone and was open to satisfaction by the payment of that number of marks, at any time, with whatever interest might have accrued, however much the mark might have fallen in value as compared with other things. [Citation.] An obligation in terms of the currency of a country takes the risk of currency fluctuations and whether creditor or debtor profits by the change the law takes no account of it. [Citation.] Obviously, in fact a dollar or a mark may have different values at different times but to the law that establishes it it is always the same. If the debt had been due here and the value of dollars had dropped before suit was brought the plaintiff could recover no more dollars on that account. A foreign debtor should be no worse off." (*Id.,* at p. 519 [71 L.Ed.2d at p. 385].) *Hicks* was distinguishable: "Here we are lending our courts to enforce an obligation (as we should put it, to pay damages) arising from German law alone and ought to enforce no greater obligation than exists by that law at the moment when the suit is brought." (*Id.,* at p. 520 [71 L.Ed. at p. 385].)

The philosophy underlying *Deutsche Bank* rests on a concept called nominalism. (See *Judgment in Foreign Currency, supra,* 22 Santa Clara L.Rev. at pp. 884-885.) When all jurisdictions potentially involved in a particular dispute share that philosophy and concept, we achieve uniformity of decision from one jurisdiction to the next (*ibid.*) and thus remove any incentive to forum shop. When "[a] suit in this country is based upon an obligation existing under the foreign law at the time when the suit is brought, . . . the obligation is not enlarged by the fact that the creditor happens to be able to catch his debtor here. [Citations.]" (*Deutsche Bank, supra,* 272 U.S. 517, 519 [71 L.Ed. 383, 385].) The risk of currency fluctuations is borne equally by creditor and debtor.

■ It seems to us that the *Deutsche Bank* rationale, which our courts embrace, is at odds with a rule that would allow a plaintiff to obtain a judgment in a foreign forum and then, upon establishing the judgment here for enforcement purposes, be protected against interim currency fluctuations. Just as the domestic forum, sitting as the trial court, must ignore currency fluctuations predating the time when the defendant had an obligation arising under domestic law, a domestic court, in an enforcement action, should ignore currency fluctuations that predate the enforcing judgment. No obligation arises in this state until the foreign judgment is established here. Allowing the court to consider prejudgment fluctuations would encourage the foreign judgment creditor to enforce the judgment in California

whenever the American dollar had risen against the foreign currency. It would promote forum shopping.

It would also make the judgment debtor an insurer, effectively allowing the plaintiff to speculate without risk of loss. If the American dollar rose, the creditor would be put in the hindsight position of having invested the judgment in dollars; if the dollar fell, the creditor would try to enforce the judgment in the foreign forum. California policy does not call for such a result. California generally does not protect domestic plaintiffs against such factors as inflation or the cost of borrowing money, especially in contract actions. "To the extent that recognition has been given to these factors, the issue has arisen in the context of tort cases wherein the purposes and calculation of damages differ from those in contract disputes. [Citations.]" (*C. Norman Peterson Co.* v. *Container Corp. of America* (1985) 172 Cal.App.3d 628, 650 [218 Cal.Rptr. 592].) Our courts have no reason to put a foreign plaintiff in a better position than a California plaintiff. (Cf. *Deutsche Bank, supra,* 272 U.S. 517, 519 [71 L.Ed. 383, 385].) Similarly, they have no reason to place a foreign judgment creditor in a better position than he would have enjoyed in the foreign forum. We have not been directed to any authority indicating that Canadian courts make allowances for postjudgment declines in the Canadian dollar as against foreign currency. In fact, the Canadian court in this case apparently considered the judgments satisfied by Landes's payments without regard for the relative strength of the American dollar.

Appellants rely on a 1986 decision by the federal Second Circuit Court of Appeals in *Competex, S.A.* v. *LaBow, supra,* 783 F.2d 333 (*Competex*). There, a Swiss broker won a default judgment in a breach of contract action against a New York client in an English court, and the judgment was expressed in pounds. The action apparently did not arise under American law. The broker brought a diversity action in federal district court to enforce the English judgment. Applying the substantive law of New York, whose courts ordinarily follow the breach-day rule, the district court reasoned that the federal action was based on the English judgment (not the underlying contract) and, accordingly, used the conversion rate in effect at the time of the foreign judgment (i.e., when the "breach"—the failure to pay that judgment—occurred).[3] (*Id.,* at p. 334.) The pound, meanwhile, had

---

[3] By the district court's reasoning (not questioned on the appeal), the "breach" and "judgment" dates were the same. Looking for a date on which the underlying action arose, the court perceived the "breach" as having occurred the moment the foreign judgment came into existence *because it was not immediately paid.* A court looking to the judgment rather than to breach as the determinative legal event would, of course, arrive at the same date. Thus, if we accept the reasoning of the district court in *Competex,* there is no initial difference between the New York and federal Supreme Court (California) approaches as applied to a foreign

depreciated relative to the dollar and kept on losing value. The client satisfied the English judgment in the devalued pounds, but the federal district court ruled, based on the pound's fall in value since the English judgment, that there remained about $236,000 due on the federal court judgment. The client appealed the court's denial of a motion to clarify the judgment (Fed. Rules Civ. Proc., rule 60(b), 28 U.S.C.), and the Second Circuit affirmed. (*Competex, supra,* at pp. 335, 339.)

*Competex* supports appellants in result only; its *rationale* supports a contrary result for California. The case was brought in diversity, and thus the court had to apply New York law. Finding no New York authority directly on point, the Second Circuit did what we have done—it looked to the state's conversion date rules for guidance. The court noted New York's rigid use of the breach-day rule and that "[t]he asserted purpose of this rule is to assure that plaintiff will be made whole by protecting him against fluctuation in relative currency values. [Citation.]" (*Competex, supra,* 783 F.2d 333, 335.) The court had harsh criticism for New York's application of the rule, calling it a "game of creditor's choice" that can do "more than make [the] plaintiff whole." (*Id.,* at p. 336.) Assuming that the judgment debtor has sufficient property in both jurisdictions, New York allows the creditor to execute on whichever judgment has the higher value. Thus, it "generously allows him to reap the benefit of appreciation in the value of the pound without risking loss as a result of the pound's depreciation."[4] (*Ibid.*) Although a debtor can prevent this by promptly paying the judgment, it was noted, that could place unfair pressure on a debtor to abandon a worthwhile appeal. (*Id.,* at pp. 336-337.)

Nevertheless, being bound to apply New York law, the court concluded: " . . . New York's choice of the breach-day conversion rule clearly implies that New York would require satisfaction of a New York enforcing judgment by payment of the dollar amount specified in that judgment and would not consider an enforcing judgment satisfied by payment of the amount of the underlying judgment in foreign currency. The breach-day rule protects the judgment creditor against fluctuation in currency values to the point of allowing him to speculate without risk. It would be anomalous to suggest that New York would allow its creditor's preference rule to be undercut by

---

judgment enforcement action. What leads to divergent results in the end is the philosophical difference between the two. (See discussion in text, *infra*.)

   [4] A recent tentative draft of the Restatement Second of Foreign Relations Law of the United States appears to go even further, effectively allowing the creditor to choose between the values of the two currencies in the enforcement action even though the debtor may not have sufficient assets in the foreign jurisdiction to satisfy the judgment there. (Rest.2d Foreign Relations Law of the U.S. (Tent. Draft No. 6, Apr. 12, 1985) § 823 and coms. *a - d*; see *Competex, supra,* 783 F.2d 333, 336.)

giving the judgment debtor the opportunity to satisfy his New York judgment by paying the underlying judgment in depreciated pounds." (*Competex, supra,* at p. 339, fn. omitted.)

California, unlike New York, does not subscribe to the creditor's choice philosophy. Our courts select a breach-day or judgment-day conversion date according to the United States Supreme Court rationale discussed above—that is, without regard for relative currency values before or after those dates. It would be anomalous to make both sides bear the risk of currency fluctuations when litigating a dispute here and yet place the risk all on one side when a party uses our courts to enforce a foreign judgment.

We hold that a California court, when enforcing a foreign judgment rendered in foreign currency, must ordinarily convert the foreign currency to American dollars using the exchange rate that was in effect at the time of the foreign judgment.[5] This rule, of course, does not prevent the parties from showing that they had an agreement that one side alone would bear the risk of postjudgment currency fluctuations (cf. *Nikimiha Securities Ltd.* v. *Trend Group Ltd.* (E.D.Pa. 1986) 646 F.Supp. 1211, 1227-1228), but no such agreement was shown in this case.

The superior court correctly deemed the California enforcing judgment satisfied in full by satisfaction of the underlying Canadian judgments in Canadian dollars, and the court's order compelling acknowledgement of satisfaction of judgment (Code Civ. Proc., § 724.050) was not in error.

---

[5] Our research discloses a factually similar California case that is consistent with our holding. *Farmer* v. *Orme* (1933) 131 Cal.App. 628 [21 P.2d 977], like our case, involved a California judgment enforcing a Canadian judgment expressed in Canadian dollars. The judgment creditor argued on appeal, and the court agreed, that there was insufficient evidence to support the amount of the enforcing judgment, for $1,702.81 in American dollars, because the lower court had simply awarded American dollars one for one, based on the Canadian judgment, without applying an exchange rate. The appellate court ordered the judgment calculated at the exchange rate in effect *at the time of the Canadian judgment. (Id.,* at pp. 630-631.) The result is consistent with the federal conversion rule approach, but it is not clear whether a different conversion date was urged on the court. The result is also consistent with our holding as to post-foreign-judgment currency fluctuations, but the issue was evidently not considered.

*Grunwald* v. *Freese* (1893) 4 Cal.Unrep. 182 [34 P. 73], a case predating the federal high court cases by three decades, seems inconsistent with the federal court rationale. In a dispute over a contract calling for delivery of Mexican currency in Japan, the court applied the breach-day rule, likening the Mexican currency to a "commodity." (*Id.,* at pp. 187-188.) That case, in turn, fueled an erroneous assumption by the Ninth Circuit Court of Appeals in *Compania Engraw Com'l E. Ind.* v. *Schenley Dist. Corp.* (9th Cir. 1950) 181 F.2d 876, at page 879, that California would follow New York's breach-day rule in contract disputes.

## DISPOSITION

The judgment (order) is affirmed.

Rouse, Acting P. J., and Benson, J., concurred.

Appellants' petition for review by the Supreme Court was denied April 20, 1988. Mosk, J., was of the opinion that the petition should be granted.