**SIEMATIC MOBELWERKE GMBH & CO. KG, Plaintiff,**

v.

**SIEMATIC CORPORATION, et al., Defendants.**

**Civil Action No. 06–CV–5165.**

United States District Court, E.D. Pennsylvania.

Nov. 4, 2009.

---

Andrew P. Hoppes, The Hoppes Law Firm LLC, Exton, PA, Christian C. Mattioli, Michael C. Falk, Reed Smith LLP, Philadelphia, PA, for Plaintiff.

Shahan G. Teberian, Klehr, Harrison, Harvey, Branzburg & Ellers, LLP, Philadelphia, PA, for Defendants.

### *MEMORANDUM*

ANITA B. BRODY, District Judge.

Plaintiff SieMatic Möbelwerke GmbH & Co. KG ("SMG") and Defendant SieMatic Corporation ("SMC") have filed briefs in response to my Order of July 15, 2009, directing the parties to submit a proposed formula for the calculation and conversion of damages and prejudgment interest from Euros (Q) to U.S. dollars ($) for SMC's breach of contract. I adopt the formula submitted by SMG and select an exchange rate date of July 15, 2009.

### I. BACKGROUND[1]

SMG is a German corporation that manufacturers, markets, and sells kitchen cabinetry throughout the world. SMC is a Georgia corporation that sold products manufactured by SMG in North America. From 2002 to 2005, SMC struggled financially but was able to sustain itself through a series of loans it obtained from various sources, including SMG. In April of 2005, in an attempt to salvage its business and allow shipments to SMC to resume, SMC entered into discussions with SMG which resulted in the execution of an agreement under which SMC agreed to act as SMG's sales agent in soliciting sales of its products in North and South America (the "2005 Sales Agency Agreement"). In exchange, the 2005 Sales Agency Agreement required SMC to acknowledge its debt to SMG in the amount of Q2,140,719.27 (the "Current Indebtedness"), and waive any and all defenses to payment of that debt. The Current Indebtedness is comprised of 800,000 owed by SMC to SMG pursuant to a 2004 Loan Agreement, plus 1,340,719.27 in an outstanding trade debt balance for products shipped by SMG to SMC prior to March 2005.

On November 22, 2006, SMG filed suit against SMC, Frank Siekmann, and SieMatic Design Studios, LLC. On August 19, 2008, SMG amended its complaint and asserted four claims, one of which was for breach of contract. SMG's breach of contract claim alleged that SMC breached the 2005 Sales Agency Agreement by (1) failing to pay certain amounts owed under that agreement (the "Current Indebtedness"), (2) failing to hold payments in trust for SMG, and (3) failing to pay certain freight and installation charges. On January 20, 2009, SMG filed a Partial Motion for Summary Judgment regarding SMC's failure to pay its Current Indebtedness. On July 15, 2009, I granted SMG's Motion (Doc. # 137) and stated in the accompanying Order (Doc. # 138) the following:

> It is further ORDERED that the plaintiff shall submit a proposed formula for the calculation and conversion of damages and prejudgment interest for SMC's breach of contract (the "Pro-

---

1. For a more extensive discussion of the background of this case, its claims, and my decision to grant summary judgment for SMG on one part of its breach of contract claim, see *SieMatic Möbelwerke GmbH & Co. KG v. SieMatic Corp.,* 643 F.Supp.2d 675 (E.D.Pa. 2009). The facts set forth in this Memorandum are taken from that opinion.

posed Formula"). The Proposed Formula should reflect the Court's ruling that the plaintiff is entitled to:

(a) 800,000 plus interest at a rate of 3.5% from April 20, 2005 until December 31, 2005, converted into U.S. Dollars, plus prejudgment interest on that amount at a rate of 6% from December 31, 2005; and

(b) Q1,340,719.27, plus prejudgment interest on that amount at a rate of 6% from June 1, 2005....

Judgment shall be entered for the plaintiff in an amount to be determined following review of the Proposed Formula and any response thereto.

## II. DISCUSSION

SMG submitted its formula on August 3, 2009 (Doc. # 142). It appears as follows:

*2004 Loan Debt*

Step 1: (Q 800,000 (loan principal) + Q 19,561.64 (interest at 3.5%)) × _____ (official exchange rate) = $ _____ (converted U.S. Dollar amount)

Step 2: $ _____ (converted U.S. Dollar amount from Step 1) + $ _____ (prejudgment interest at 6%) = $ _____ (Total for 2004 Loan Debt).

*Trade Debt*

Step 1: Q1,340,719.27 (trade debt principal) × _____ (official exchange rate) = $ _____ (converted U.S. Dollar amount)

Step 2: $ _____ (converted U.S. Dollar amount from Step 1) + $ _____ (prejudgment interest at 6%) = $ _____ (Total for Trade Debt).

SMC filed its response on August 17, 2009 (Doc. # 152). SMC does not object to the formula SMG proposed, but does object to SMG's suggestion that I use the exchange rate applicable to the date of judgment as opposed to the date of SMC's breach of contract. For the 2004 Loan Debt, the date of breach would be December 31, 2005. No exchange rate was published on December 31, 2005, but the exchange rate on December 30, 2005 was 1.1842.[2] For the Trade Debt, the date of breach would be June 1, 2005. The exchange rate on June 1, 2005 was 1.2254.[3] The exchange rate as of the date I granted SMG's Partial Motion for Summary Judgment, July 15, 2009, was 1.4116.[4] The current exchange rate, which would correspond to the date of judgment, hovers around 1.48.[5] The exchange rate is a multiplier in SMG's formula and therefore the higher the rate is the more money SMC will owe. SMC argues that choosing the exchange rate applicable on the date of judgment rather than the date of breach would result in a windfall for SMG of more than $500,000. Consequently, the sole issue I must determine is which date is appropriate to set as the date for which a corresponding exchange rate should be applied in SMG's formula.

### A. Legal Standard: Flexible v. Mechanical Approach

██ Both parties agree that *Nikimiha Sec. Ltd. v. Trend Group Ltd.*, 646 F.Supp. 1211 (E.D.Pa.1986), is the most relevant case on this issue. *Nikimiha* involved a suit filed by a lender against a borrower and guarantor to recover on bills of exchange, promissory notes, and guaranties. In the damages section of the opinion, the court addressed the question of how to

**2.** New York Federal Reserve Historical Exchange Rates, http://www.federalreserve.gov/releases/h10/20060103/.

**3.** *Id.* at http://www.federalreserve.gov/releases/h10/20050606/.

**4.** *Id.* at http://www.federalreserve.gov/releases/h10/20090720/.

**5.** Wall Street Journal Market Data Center, http://online.wsj.com/mdc/public/page/2_3021–forex.html?mod=mdc_pastcalendar (last visited October 30, 2009).

select an appropriate exchange rate date. First, it determined that state law governed the exchange rate date in the diversity suit because the rate would affect the amount of damages the lender could recover and therefore was substantive (i.e., outcome determinative) rather than procedural. *Id.* at 1228. Neither party in the present case objects to the application of state law to this issue.

Next, the *Nikimiha* court found that the Pennsylvania Supreme Court had never addressed how to determine the proper date for conversion of foreign currency in a breach of contract action. *Id.* at 1227. The court predicted that if the Pennsylvania Supreme Court were to address the issue, it would most likely look to the RESTATEMENT OF FOREIGN RELATIONS LAW OF THE UNITED STATES ("RESTATEMENT") § 823(2), which states that a court should choose a date of conversion such that the exchange rate will "make the creditor whole and [will] avoid rewarding a debtor who has delayed in carrying out the obligation." Comment (c) to § 823 adds:

> [T]he date used for conversion should depend on whether the currency of obligation has appreciated or depreciated relative to the dollar. In general, if the foreign currency has depreciated since the injury or breach, judgment should be given at the rate of exchange applicable on the date of injury or breach; if the foreign currency has appreciated since the injury or breach, judgment should be given at the rate of exchange applicable on the date of judgment or the date of payment.

*Id.* Comment (c) also notes that the court "should assure that neither party receives a windfall or is penalized as a result of currency conversion." *Id.*

Neither party disputes the relevance of the RESTATEMENT. The Third Circuit has long held that "[e]ven without express approval by a state court of a Restatement principle, ... the Restatement [is] evidence of state law in the absence of direct local authority." *United States v. Sommerville*, 324 F.2d 712, 723 (3d Cir.1963). Instead, the parties differ over the application of the RESTATEMENT to the facts of this case. SMG argues that because the Euro has appreciated since SMC's breach of the 2005 Sales Agency Agreement, a plain reading of § 823(2) and Comment (c) suggests that judgment should be given at the exchange rate applicable on the date of judgment. SMC argues that using the judgment day exchange rate would result in a windfall for SMG and that the use of the breach day exchange rate is sufficient to make SMG whole.

SMG's interpretation of the RESTATEMENT is based on the *Nikimiha* court's observation that the RESTATEMENT's "rule prevents fluctuating exchange rates from causing the injured or non-breaching party to bear the loss." *Nikimiha*, 646 F.Supp. at 1227. The court acknowledged that such a rule heavily favored the creditor but noted that "the debtor can eliminate this 'creditor preference' by paying the debt owed." *Id.* The court concluded that "[b]etween the innocent party and the breaching party, the breaching party should bear the exchange risk." *Id.*

Other courts have not been so quick to embrace the RESTATEMENT's approach. For example, "the Second Circuit has criticized the RESTATEMENT as an 'extreme rule of creditor's preference that can enable the creditor to benefit from currency fluctuations.'" *Nikimiha*, 646 F.Supp. at 1227 (quoting *Competex S.A. v. Labow*, 783 F.2d 333, 336 (2d Cir.1986)). The Second Circuit has questioned the prudence of Section 823, which both enables creditors to benefit from currency fluctuations and warns courts not to enable a party to receive a windfall. *See Competex S.A.*, 783

F.2d at 336 & n. 5. *Cf. S.A.R.L. Aquatonic–Laboratoires PBE v. Marie Katelle, Inc.,* No. CV 06–640–PHX–FJM, 2007 WL 2410373, at *2 (D.Ariz. Aug. 21, 2007) (concluding that Arizona courts would follow the RESTATEMENT, but declining to use the conversion rate in effect at the date of judgment because the Euro had appreciated and the court did not want to provide an unwarranted windfall to plaintiff).

In cases for which federal law applies, the exchange rate date is determined by the jurisdiction in which the plaintiff's cause of action arose. As the First Circuit has written, "The judgment day rule applies only when the obligation arises entirely under foreign law. If, however, at the time of breach the plaintiff has a cause of action arising in this country under American law, the breach day rule applies." *In re Good Hope Chem. Corp.,* 747 F.2d 806, 811 (1st Cir.1984). The breach day rule was developed by the Supreme Court in *Hicks v. Guinness,* 269 U.S. 71, 46 S.Ct. 46, 70 L.Ed. 168 (1925). In that case, the Court wrote that "[t]he loss for which the plaintiff is entitled to be indemnified ... happens at the moment when the contract is broken ... and the plaintiff's claim is for the amount of that loss valued in money at that time." *Id.* at 80, 46 S.Ct. 46.

In the absence of pertinent state law precedent, federal courts in diversity suits have frequently adopted the federal approach. *See ReliaStar Life Ins. Co. v. IOA Re, Inc.,* 303 F.3d 874, 883 (8th Cir. 2002) (Minnesota); *Ingersoll Milling Mach. Co. v. Granger,* 833 F.2d 680, 692 (7th Cir.1987) (Illinois); *Brill Gloria Hausund Gartengerate GmbH v. Sunlawn, Inc.,* No. 08–cv–00211–MSK–MEH, 2008 WL 5651458, at *5 (D.Colo. Aug. 5, 2008) (Colorado); *Ligas v. IPD Sales & Mktg., LLC,* No. 4:06–cv–798 (CEJ), 2007 WL 2908893, at *3 (E.D.Mo. Oct. 4, 2007) (Missouri); *Capital Law v. Viar,* 338 F.Supp.2d 891, 894 (W.D.Tenn.2004) (Tennessee); *Gathercrest, Ltd. v. First Am. Bank & Trust,* 649 F.Supp. 106, 120–21 (M.D.Fla.1985) (Florida).

New York, Massachusetts, California, and Washington have more clearly established law on this issue. New York courts follow the "judgment date" rule. *See Dynamic Cassette Int'l Ltd. v. Mike Lopez & Assocs.,* 923 F.Supp. 8, 11–12 (E.D.N.Y. 1996) (noting that prior to the enactment of New York Judiciary Law § 27(b) in 1987, New York followed the breach day rule). The Massachusetts Supreme Court has adopted the "payment date" rule, whereby the exchange rate used is the one applicable on the day of or day before payment. *Manches & Co. v. Gilbey,* 419 Mass. 414, 646 N.E.2d 86, 87–89 (1995). California's intermediate appellate court has adopted the federal approach. *See Pecaflor Constr., Inc. v. Landes,* 198 Cal. App.3d 342, 243 Cal.Rptr. 605 (1988).

Washington's intermediate appellate court has adopted the flexible approach taken by the court in *Nikimiha* and encouraged by the RESTATEMENT. *See Aker Verdal A/S v. Neil F. Lampson, Inc.,* 65 Wash.App. 177, 828 P.2d 610 (1992). In *Aker Verdal,* the Washington Court of Appeals concluded that in addressing these exchange rate dilemmas, courts should remember that "the overriding concern is to reach an equitable result, which cannot be achieved through the application of a rigid rule," *id.* at 615, such as the federal approach. The Washington court noted that in the leading case discussing the federal rule, *In re Good Hope Chem. Corp.,* 747 F.2d 806, 811 (1st Cir.1984), the mechanical application of the rule led to an inequitable result. The First Circuit, in *In re Good Hope Chem. Corp.,* determined that the plaintiff had a cause of action arising in the United States under American law and therefore applied the breach day rule.

However, the First Circuit acknowledged that because the foreign currency had appreciated since the date of breach, "[t]o put [the plaintiff] as nearly as possible in the position it would have enjoyed had the contract not been breached, we would have to use the judgment day rate of exchange." *Id.* at 812–13 n. 8. It also noted that "more flexibility ... might be desirable," *id.*, but ultimately concluded that it was bound by the Supreme Court precedent. After analyzing the First Circuit's comments, the Washington Court of Appeals declined to follow the federal approach and adopted the equitable approach of the RESTATEMENT. Because the dollar had depreciated since the breach date in that case, the Washington court applied the judgment day exchange rate.

In fact, in light of the First Circuit's discomfort with a mechanical approach to the exchange rate dilemma, the flexible approach of *Nikimiha* and *Aker Verdal* appears more reasonable than the federal approach. Two different student notes addressing the exchange rate problem not only encourage a flexible approach, but also argue that the breach day rule is somewhat of an anachronism, stemming from earlier times when it was assumed that foreign currencies were more likely to depreciate in comparison to the dollar. *See* Note, *The Need to Retreat from Inflexible Conversion Rules—An Equitable Approach to Judgment in Foreign Currency*, 22 SANTA CLARA L.REV. 871 (1983); Note, *Conversion Date of Foreign Money Obligation*, 65 COLUM. L.REV. 490 (1965). Consequently, I concur with the court's conclusion in *Nikimiha* that Pennsylvania's Supreme Court would follow the RESTATEMENT.

### B. Windfall Analysis

■ However, as the Second Circuit noted in *Competex,* the relatively simplistic approach encouraged by the RESTATEMENT is complicated by its admonition that

courts refrain from affording windfalls to either party. No case law explains where the dividing line is between a judgment-debtor bearing the burden of exchange rate fluctuations and a judgment-creditor receiving a windfall. Thus, it is difficult to determine whether, in the present case, applying the judgment day exchange rate affords SMG a windfall simply because the Euro has appreciated substantially since 2005.

Critics of the flexible approach argue that it allows a creditor to manipulate the litigation in order to obtain a more favorable exchange rate. *See Aker Verdal,* 828 P.2d at 615; *Pecaflor Constr., Inc. v. Landes,* 198 Cal.App.3d 342, 243 Cal.Rptr. 605, 608–10 (1988) (commenting on *Competex S.A. v. Labow,* 783 F.2d 333, 336 (2d Cir.1986)). It may be that the RESTATEMENT's admonition to avoid providing windfalls is meant to act as a check on creditor-plaintiffs manipulating litigation in bad faith. Yet, based on the fact that SMG filed suit in November 2006, when the exchange rate was at 1.2928, and which was less than a year after SMC breached its loan obligations, it seems unlikely that SMG has manipulated the litigation process to obtain a higher exchange rate.

At the same time, considering that the exchange rate on July 15, 2009, the day I granted SMG's Partial Motion for Summary Judgment, was 1.4116, it is unfair to apply the current exchange rate of approximately 1.48. Facing somewhat similar circumstances, a district court in Arizona used its discretion to set a proper date for conversion so as not to provide the plaintiff with a windfall. In *S.A.R.L. Aquatonic–Laboratoires PBE v. Marie Katelle, Inc.,* No. CV 06–640–PHX–FJM, 2007 WL 2410373, at *2 (D.Ariz. Aug. 21, 2007), the court was tasked with enforcing a French judgment from September 6, 2005 after granting summary judgment for the plain-

tiff on May 31, 2007. The plaintiff requested that the court adopt June 5, 2007 (i.e., approximately the judgment date), as the exchange rate date. The exchange rate on that day was 1.3519.[6] The exchange rate on the date of the French judgment, September 6, 2005, was 1.2483.[7] The court concluded that "to use the conversion rate in effect at the date judgment enters in this case … would give plaintiff an unwarranted windfall." *Id.* Therefore, the court adopted the exchange rate that corresponded with the date of the French judgment, September 6, 2005. *Id.*

In the present case, I too have the discretion to set an appropriate date for the conversion of foreign currency so as not to provide SMG with an unwarranted windfall. In light of the Euro's appreciation between July 15, 2009, the date I granted SMG's Partial Motion for Summary Judgment, and the present, I adopt the exchange rate value for July 15, 2009, which was 1.4116, in calculating SMG's damages. I consider July 15, 2009 the date of judgment. It was only out of an abundance of caution that I gave the parties an opportunity to suggest an appropriate formula for the calculation and conversion of damages and prejudgment interest. It would be unfair to further penalize SMC due to my inquiry.

## III. CONCLUSION

In sum, I adopt SMG's proposed formula for the calculation and conversion of damages and prejudgment interest for SMC's breach of contract, with the exception that I shall use the exchange rate value of 1.4116, which corresponds to the exchange rate as of July 15, 2009, the date I granted SMG's Partial Motion for Summary Judgment. After inputting the proper values, the total amount of damages equals:

*2004 Loan Debt*

Step 1: $(Q800,000 + 19,561.64) \times 1.4116 = \$1,156,893.21$

Step 2: $\$1,156,893.21 + \$266,434.09$ [8] $= \mathbf{\$1,423,327.30}$

*Trade Debt*

Step 1: $Q1,340,719.27 \times 1.4116 = \$1,892,559.32$

Step 2: $\$1,892,559.32 + \$501,191.19$ [9] $= \mathbf{\$2,393,750.51}$

*Total Debt* $= \$1,423,327.30 + \$2,393,750.51 = \boldsymbol{\$3,817,077.81}$

Finally, SMG requests that I order SMC to pay post-judgment interest if it fails to pay its debt. SMC does not contest the appropriateness of post-judgment interest, therefore I shall grant SMG's request in the Order that follows.

## *ORDER*

**AND NOW,** this 3rd day of November, 2009, upon consideration of the parties' responses to the Court's Order of July 15, 2009 (Doc. # 138), *see* Plaintiff SieMatic Möbelwerke GmbH & Co. KG's ("SMG") Memorandum of Law Addressing Proposed Formula (Doc. # 142) and Defendant SieMatic Corporation's ("SMC") Response (Doc. # 152), it is **ORDERED** that

---

6. Wall Street Journal Market Data Center, http://online.wsj.com/mdc/public/page/2_3021–forex–20070605.html?mod =mdc_past-calendar.

7. New York Federal Reserve Historical Exchange Rates, http://www.federalreserve.gov/releases/h10/20050912/.

8. Prejudgment Interest at 6% = $266,434.09 = \$1,156,893.21 (converted U.S. Dollar amount from Step 1) × .060 × 3.8384 [ (# Days between December 31, 2005 (date of breach) and November 3, 2009 (Date of Judgment) =1401 days)/365].

9. Prejudgment Interest at 6% = $501,191.19 = \$1,892,559.32 (converted U.S. Dollar amount from Step 1) × .060 × 4.4137 [ (# Days between June 1, 2005 (date of breach) and November 3, 2009 (Date of Judgment) = 1611 days)/365].

**JUDGMENT** is entered in favor of SMG and against SMC on Count I of SMG's Complaint in the amount of **$3,817,077.81.** This amount equals the sum of (1) $1,423,327.30 (2004 Loan Debt, including prejudgment interest); and (2) $2,393,750.51 (Trade Debt, including prejudgment interest).

It is further **ORDERED** that post-judgment interest will accumulate from the date judgment is entered pursuant to 28 U.S.C. § 1961. Post-judgment interest shall be calculated at a rate equal to the weekly average 1–year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of judgment. *Id.* at § 1961(a). Interest shall be computed daily to the date of payment and shall be compounded annually. *Id.* at § 1961(b).