**SIEMATIC MOBELWERKE GMBH & CO. KG, Plaintiff,**

v.

**SIEMATIC CORPORATION, Siematic Design Studios, LLC Frank W. Siekmann, Defendants.**

**Siematic Corporation and Frank Siekmann, Counterclaim–Plaintiffs,**

v.

**Siematic Mobelwerke GmbH & Co KG, and Ulrich Siekmann, Counterclaim–Defendants.**

No. 06–CV–5165.

United States District Court, E.D. Pennsylvania.

July 15, 2009.

Andrew P. Hoppes, The Hoppes Law Firm LLC, Exton, PA, Christian C. Mattioli, Michael C. Falk, Reed Smith LLP, Philadelphia, PA, for Plaintiff/Counterclaim–Defendants.

Shahan G. Teberian, Klehr, Harrison, Harvey, Branzburg & Ellers, LLP, Philadelphia, PA, for Defendants/Counterclaim–Plaintiffs.

## *MEMORANDUM*

ANITA B. BRODY, District Judge.

## I. Background[1]

Plaintiff SieMatic Möbelwerke GmbH & Co. KG ("SM Germany") is a German corporation that manufacturers, markets, and sells kitchen cabinetry throughout the world. Defendant SieMatic Corporation ("SMC") is a Georgia corporation, that sold products manufactured by SM Germany in North America.[2] Both SMC and SM Germany were owned and controlled by AW Siekmann until 1997, at which time AW Siekmann transferred ownership of SMC to his son, defendant Frank Siekmann, and ownership of SM Germany to his other son, counterclaim defendant Ulrich Siekmann.[3] Defendant SieMatic Design Studios, LLC ("SDS") is a Delaware company, of which Frank Siekmann is the sole member.[4] Frank Siekmann is a resident of Pennsylvania.

From 1997 to 2002, SMC was a profitable corporation.[5] During this period, SMC benefitted from financial assistance from SM Germany, both in the form of formal loans, and other informal assistance such as prolonged payment terms. (Ulrich Siekmann Dep. 51:2–54:22, March 13, 2008.) The first formal loan SM Germany made to SMC was in 2001. (Ulrich Siekmann Dep. 52:22–53:6.) A second loan was made in 2003, by which time Ulrich Siekmann was aware that SMC was experiencing some financial difficulties. (Ulrich Siekmann Dep. 63:4–64:7; 194:24–195:7.) Frank Siekmann also made shareholder loans to SMC. On September 10, 1999, Frank Siekmann executed a Loan Agreement and Promissory Note (the "1999 Loan Agreement") by which he loaned $1,809,204.69 to SMC. (Dfs.' Mot. for Summ. J. Ex. 13, 1999 Loan Agreement ¶ 1.) Frank Siekmann's shareholder loans to SMC eventually totaled over $3.8 million; however, the 1999 Loan Agreement was the only advance covered by a written loan agreement.[6] (Frank Siekmann Dep. 93:1–5, 143:8–146:5, March 10, 2008.)

In 2000, Frank Siekmann expanded his business with the acquisition of Merit Kitchen Ltd. ("Merit"), another kitchen cabinetry manufacturer based in Canada.

---

1. The facts are taken from the record presented in the defendants' amended summary judgment motion (Doc. # 106) and the plaintiff's response (Doc. # 117), and viewed in the light most favorable to the non-moving party. Because the Court has issued previous opinions in this case, the parties are presumed familiar with the procedural history and I recite only the procedural facts related to the issues now pending.

2. SMC also sold products manufactured by SieMatic Canada ("SM Canada") in North America. SM Canada is purportedly owned by Frank Siekmann and is not affiliated with SM Germany.

3. Frank Siekmann and Ulrich Siekmann are half-brothers.

4. SDS changed its name to TPPC Holdings, LLC in 2006, but for ease of reference will be identified as SDS throughout this opinion.

5. In 2000, SMC generated $28,024,720.00 in gross revenue, resulting in a net taxable income of $1,639,973.00. (Am. Compl. ¶ 20.) In 2001, SMC reported gross revenue of $28,982,591.00, resulting in a net taxable income of $1,780,70.00. (See Pl.s' Resp. to Dfs.' Mot. for Summ. J. Ex. B, SMC Corporate Tax Returns for 2001, 2002.) In 2002, SMC reported gross revenues of $30,402,638.00, resulting in a net taxable income of $889,781.00. (Id.)

6. The additional loans made to SMC by Frank Siekmann are evidenced by a reference in SMC's tax returns to "Shareholder Loans" in the amount of $1,500,000.00 as of December 31, 2002, and $2,800,000.00 as of December 31, 2003. (Am. Compl. Ex. D, SMC 2003 Tax Return.) Frank Siekmann also testified that he loaned an additional $1,000.000.00 to SMC in 2004. (Frank Siekmann Dep. 92–93.)

(Frank Siekmann Dep. 81:15–83:18.) In 2002, Frank Siekmann acquired a 51% interest in Hausscape, Inc. ("Hausscape"), a kitchen cabinetry dealer based in Florida.[7] (Frank Siekmann Dep. 84:23–85:22.)

On April 1, 2003, AW Siekmann executed an agreement (the "2003 Licensing Agreement") in which he granted Frank Siekmann a license to use the SieMatic name in connection with the sale of products manufactured by SieMatic Germany in a territory including North and South America (the "License").[8] In the same agreement, AW Siekmann granted his other children, Ulrich Siekmann and Kathrin André, a license to use the SieMatic name in Europe and most of the rest of the world.

Despite obtaining the North American License, SMC continued to struggle financially.[9] By 2004, SMC's financial situation had become critical. (Ulrich Siekmann Dep. 64:14–18; 77:10–11; 194:24–195:2.) On May 13, 2004, AW Siekmann agreed to make a loan to Frank Siekmann ("the 3rd Party Loan Agreement") comprised of a cash loan of 800,000 and a credit in the amount of Q400,000 (approximately $1,800,000.00 in U.S. dollars, based on the exchange rates used in the Amended Complaint). The 3rd Party Loan Agreement states that its purpose is to "achieve an immediate increase in liquidity" which was necessary, according to Frank Siekmann, "because of the extremely strained situation." (Am. Compl. Ex. F, 3rd Party Loan Agreement, Recitals.) The 3rd Party Loan Agreement provides for a security interest in favor of AW Siekmann "by assets of SMC and/or the Frank W. Siekmann group of companies (including Bekermann, SieMatic Canada and Merit)." (3rd Party Loan Agreement ¶ 2.) The agreement further provides that should SMC file for insolvency, Frank Siekmann must assign his rights to the SieMatic trademark back to AW Siekmann. (3rd Party Loan Agreement ¶ 6.)

One month later, in June 2004, SM Germany made an additional loan to SMC in the amount of Q800,000 (approximately $1,250,000.00 in U.S. dollars, based on exchange rates used in the Amended Complaint) (the "2004 Loan Agreement"). To provide security for the 2004 Loan Agreement, SMC assigned "all present and future receivables" from its customers to SM Germany, except for those receivables on which a Canadian bank had liens. (Am. Compl. Ex. G, 2004 Loan Agreement ¶ 6.) Notwithstanding this infusion of capital, SMC continued to deteriorate financially.[10]

In December of 2004, Frank Siekmann founded SDS, a limited liability company

---

7. Frank Siekmann no longer owns any share in Hausscape. (Frank Siekmann Dep. 84:4–85:17.)

8. It is unclear from the pleadings, but AW Siekmann apparently retained the license to the SieMatic name despite transferring ownership of the SieMatic businesses to his sons in the mid–90s. Frank Siekmann testified that AW Siekmann had promised him the License for years, but a written agreement did not come to fruition until 2003. (Frank Siekmann Dep. 162:3–14.)

9. SMC's corporate tax return for 2003 reported a net loss of $2,308,932.00 (Am. Compl. Ex. D, SMC 2003 Tax Return.)

10. SMC's 2004 Balance Sheet treated the $3.8 million in Shareholder Loans from Frank Siekmann as equity. (Am. Compl. Ex. H, SMC's 2004 Balance Sheet.) The plaintiff contends that had SMC treated the $3.8 million "Loan from Shareholder" as a liability on the 2004 Balance Sheet, as it had been treated in the past, SMC's total liabilities would have exceeded its assets and therefore it would have been insolvent on a balance sheet basis as of December 31, 2004. (Am. Compl. ¶ 42.)

of which he was the sole member. (Frank Siekmann Dep. 189:18–23.) SDS was established to operate SMC's design center showrooms; however, SMC's design center showrooms were phased out shortly after SDS's formation. SDS never employed any workers or conducted any business.[11] (Frank Siekmann Dep. 189:24–193:11.)

In early 2005, due to mounting delinquencies in payments, SM Germany suspended shipments of products to SMC. (Frank Siekmann Dep. 181:15–18.) In February 2005, Frank Siekmann acknowledged that one possible scenario for SMC might be bankruptcy. (*See* Pl.s' Resp. to Dfs.' Mot. for Summ. J. Ex. L, Email dated February 22, 2005.) In April of 2005, in an attempt to salvage its business and allow shipments to SMC to resume, SMC entered into discussions with SM Germany which resulted in the execution of an agreement under which SMC agreed to act as SM Germany's sales agent in soliciting sales of its products in North and South America (the "2005 Sales Agency Agreement"). In exchange, the 2005 Sales Agency Agreement required SMC to acknowledge its debt to SM Germany in the amount of Q2,140,719.27 (approximately $3,300,000.00 in U.S. dollars, based on exchange rates used in the Amended Complaint) (the "Current Indebtedness"), and waive any and all defenses to payment of

that debt."[12] (2005 Sales Agency Agreement, Recitals; ¶ 17.) The agreement further provides that all payments for SM Germany products would be made directly to SM Germany via payment into a lock-box account. (2005 Sales Agency Agreement, ¶ 6(a).) Payments mistakenly sent by customers to SMC were to be "held in trust" by SMC for SM Germany. (*Id.*)

By June 2005, SMC was financially unable to continue its operations.[13] SM Germany alleges that beginning in late 2004, while SMC was insolvent, SMC transferred cash and other property to SDS and/or Frank Siekmann, with the intent to defraud SMC's creditors, including SM Germany.[14] The transfers at issue (collectively, the "Transfers"), are as follows:

## (1) *The Showroom Assets*

On December 31, 2004, Frank Siekmann individually "purchased" the assets comprising the showroom design business of SMC (the "Showroom Assets") pursuant to an agreement dated December 31, 2004, between Frank Siekmann and SMC (the "Showroom Asset Purchase Agreement"). SMC did not receive a cash payment for the Showroom Assets; instead, Frank Siekmann paid for the Showroom Assets by reducing the aggregate amount of his shareholder loan balance with SMC[15] in an amount equal to the good faith valuation of the Showroom Assets.[16] (Pl's. Resp. to

---

11. SMC alleges that SDS was formed as a shell company through which Frank Siekmann funneled fraudulently transferred assets from SMC.

12. The Current Indebtedness comprises Q800,000 owed by SMC to SM Germany pursuant to a 2004 Loan Agreement, plus Q1,340,719.27 in an outstanding trade debt balance for products shipped by SM Germany prior to March 2005. (2005 Sales Agency Agreement, Recitals.)

13. SieMatic Canada also went out of business and into receivership in early June 2005.

(*See* Pl.'s Resp. to Dfs.' Mot. for Summ. J. Ex. P.)

14. SMC is also accused of intentionally disposing of documents, computers, and hard drives from SMC's corporate offices in Trevose, Pennsylvania. (Am. Compl. ¶¶ 73–75.)

15. The Showroom Asset Purchase Agreement acknowledges that Frank Siekmann's aggregate shareholder loan balance was approximately $3.8 million as of December 31, 2004.

16. Frank Siekmann indicated on his 2005 Schedule C tax filing that he received

Dfs.' Mot. Summ. J. Ex. V ¶¶ 1–2.) The Showroom Asset Purchase Agreement states that the assets were transferred from SMC to Frank Siekmann "free and clear of any mortgage, pledge, security interest, lien, restriction on use or transfer, any conditional sale or other title retention agreement, or any lease in the nature thereof." (Showroom Asset Purchase Agreement ¶ 3.)

#### (2) *The Merit Receivable*

In January 2005, Frank Siekmann also purchased a trade receivable from Merit Kitchens, by way of an agreement dated January 1, 2005, in exchange for a reduction in the aggregate amount of Frank Siekmann's shareholder loan balance in an amount equal to the receivable, $424,442.86 (the "Merit Receivable Agreement"). The Merit Receivable Agreement also contains language that the receivable is transferred free and clear of any liens or security interests. (Pl's. Resp. to Dfs.' Mot. for Summ. J. Ex. X. ¶ 3.)

#### (3) *The Hausscape Receivable*

Frank Siekmann made a similar arrangement with respect to a loan made to Hausscape by SMC, agreeing to purchase the loan in exchange for a reduction in his shareholder loan balance with SMC (the "Hausscape Receivable Agreement").[17] As with the Showroom Asset Agreement and the Merit Receivable Agreement, the Hausscape Receivable Agreement states that the assets were transferred "free and clear of any mortgage, pledge, security interest, lien, restriction on use or trans-

fer, any conditional sale or other title retention agreement, or any lease in the nature thereof." (Pl's. Resp. to Dfs.' Mot. for Summ. J. Ex. Y ¶ 3.)

#### (4) *The Trademarks*

Frank Siekmann also transferred ownership of the Hausscape trademark and the Bekermann Kitchens trademark from SMC to himself, by agreements dated December 31, 2004 and January 1, 2005, respectively, in exchange for a reduction in the aggregate amount of debt owed to Frank Siekmann. (Pl's. Resp. to Dfs.' Mot. for Summ. J. Exs. Z, AA.) The amount was to be reduced by $5,000.00 for the Hausscape trademark and $15,000.00 for the Bekermann Kitchens trademark. (*Id.*) Each of these agreements contained a provision clearly stating that the assets were transferred free and clear of any liens or encumbrances. (*Id.* at ¶ 3.)

The Transfers total approximately $1 million in assets. In addition, SM Germany claims that in May 2005, Frank Siekmann deposited $808,436,94 in funds that were supposed to be held in trust for SM Germany pursuant to the 2005 Sales Agency Agreement (the "Customer Trust Payments"), into SMC's commercial bank account at Citizens Bank and used those funds to pay SMC expenses during the final weeks it was in business. (Am. Compl. ¶ 67; Pl.s' Resp. to Dfs.' Mot. for Summ. J. Ex. R, SMC Citizens Bank Account information). Between June 2005 and October 2005, Frank Siekmann also deposited Customer Trust Payments di-

---

$310,000.00 for these assets, although they were valued at $660,000. (*See* Pl.'s Resp. to Dfs.' Mot. for Summ. J. Ex. W, 2005 IRS Schedule C.)

**17.** The Hausscape Receivable Agreement states that the purchase price of the loan shall be $294,076.00 (Pl's. Resp. to Dfs.' Mot. for Summ. J. Ex. Y ¶ 1); however, the Amended

Complaint claims that the amount in dispute with respect to the Hausscape Receivable is $373,176.00 (Am. Compl. ¶¶ 105–107; *see also* Dfs.' Mot. for Summ. J. ¶ 40(d).) The $373,176.00 figure is also reflected in the SMC 2004 Balance Sheet which contains a "Related Party Note Receivable" in this amount. (Am. Compl. Ex H.)

rectly into an SDS bank account. (Pl.s' Resp. to Dfs.' Mot. for Summ. J. Ex. O, SDS Citizens Bank Account Deposit Slips.) These sums were allegedly paid by customers of SMC, but were due and owning to SM Germany pursuant to the 2005 Sales Agency Agreement.

Between July 2005 and March 2006, after SMC had gone out of business, Frank Siekmann signed checks drawn against the SDS Citizens Bank Account, payable to himself, for the purported purposes of covering travel, consulting, various other expenses related to SMC and other companies owned or controlled by Frank Siekmann. (*See* Pl.'s Resp. to Dfs.' Mot. for Summ. J. Ex. S, SDS Citizens Bank Account cancelled checks.) SM Germany was not aware of these payments.

On July 1, 2005, SM Germany and Frank Siekmann and entered into an agreement with the newly formed Kitchen Interior Designs, Inc. ("KID"),[18] in which SMC transferred its License to KID in return for KID's obligation to pay Frank Siekmann certain fees, and SM Germany agreed to act as the surety for KID's obligations under that agreement (the "2005 KID Agreement").

Between July 6, 2005 and September 15, 2005, Frank Siekmann began to transfer assets from the SDS Citizens Bank Account at Citizens Bank to an SDS bank account at Wilmington Trust Bank. (*See* Pl.'s Resp. to Dfs.' Mot. for Summ. J. Ex. T, SDS Citizens Bank Account information.) Beginning in January 2006, Frank Siekmann began to transfer funds on deposit in the SDS Wilmington Trust Bank account to himself and other entities owned or operated by him. (*See* Pl.'s

Resp. to Dfs.' Mot. for Summ Ex. U, SDS Citizens Bank Account cancelled checks.) SDS did not owe these other entities any debt. (Frank Siekmann Dep. 191:7–8.)

On November 22, 2006, SM Germany filed suit against SMC, Frank Siekmann, and SDS. The complaint was amended on August 19, 2008 (the "Amended Complaint") (Doc. # 58). The Amended Complaint contains four counts:

Count I—Breach of Contract (*SM Germany v. SMC*) for SMC's alleged breach of the 2005 Sales Agency Agreement by (1) failing to pay certain amounts owed under that agreement (e.g., the Current Indebtedness) (Am. Compl. ¶¶ 114–116), (2) failing to hold payments in trust for SM Germany (Am. Compl. ¶ 117), and (3) failing to pay certain freight and installation charges (Am. Compl. ¶¶ 118–121).

Count II—Fraudulent Transfer under Pa.C.S.A. § 5104 (*SM Germany v. SMC, SDS and Frank Siekmann*) for transferring customer payments and other corporate assets from SMC to SDS and Frank Siekmann with the intent to hinder, delay or defraud SM Germany;

Count III—Fraudulent Transfer under Pa.C.S.A. § 5105 (*SM Germany v. SMC, SDS and Frank Siekmann*) for transferring customer payments and other corporate assets at a time when SMC was insolvent or facing insolvency, without receiving reasonably equivalent value; and

Count IV—Piercing the Corporate Veil (*SM Germany v. Frank Siekmann*) seeking to hold Frank Siekmann personally liable for any damages awarded to SM Germany.[19]

---

18. SMC alleges that KID was an entity created by SM Germany to take over SMC operations. (Countercls.¶ 20.)

19. Although brought as a "count" of the plaintiff's complaint, an attempt to pierce the corporate veil is not itself a cause of action, but rather is a means of imposing liability on an underlying cause of action, such as a tort or breach of contract.

On January 30, 2009, the defendants moved for summary judgment on the portion of plaintiff's breach of contract claim seeking damages for failure to pay freight charges (Am. Compl. ¶¶ 117–121, Count I), and on each of the remaining counts of the Amended Complaint for fraudulent transfer under Pa.C.S.A. § 5104 (Count II), Pa. C.S.A. § 5105 (Count III), and piercing SMC's corporate veil (Count IV) (Doc. # 101).[20]

On the same date, SM Germany also moved for partial summary judgment against SMC on Count I of the Amended Complaint, breach of contract for failure to pay the Current Indebtedness (Am. Compl. ¶¶ 114–116) (Doc. # 102).

For the following reasons, plaintiff's motion for summary judgment for breach of contract for failure to pay the Current Indebtedness is granted; defendants' motion for summary judgment for breach of contract for failure to pay freight charges is granted; and defendants' motion for summary judgment of the fraudulent transfer claims and piercing the corporate veil is denied.

## II. Summary Judgment Standard

To prevail on a motion for summary judgment, the court must find that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). Facts are "material" when they might affect the outcome of the case, and a "genuine issue" exists when the evidence would allow a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–52, 106 S.Ct. 2505, 91 L.Ed.2d 202

(1986). The moving party "is entitled to judgment as a matter of law" when the non-moving party fails to make an adequate showing on an essential element for which he has the burden of proof at trial. *See Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 804, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999). To overcome a motion for summary judgment, the non-moving party "may not rely merely on allegations or denials" but must "set out specific facts showing a genuine issue for trial." Fed.R.Civ.P. 56(e). Although a court may only consider "facts that would be admissible in evidence," *id.*, parties do not have to "produce evidence in a form that would be admissible at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). There must, however, be sufficient evidence for a jury to return a verdict in favor of the nonmoving party. If the evidence is "merely colorable or not significantly probative, summary judgment should be granted." *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir.1994). As in a motion to dismiss, the court must draw all reasonable inferences in favor of the non-moving party. *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278 (3d Cir. 2000).

## III. Discussion

I first address plaintiff's motion for partial summary judgment on Count I of the Amended Complaint for breach of contract. In addressing the plaintiff's motion for summary judgment, I draw all reasonable inferences in favor of the defendants. Next, I turn to the defendants' motion for summary judgment on all counts. In addressing the defendants' motion for summary judgment, I draw all reasonable inferences in favor of the plaintiff.

---

**20.** The defendants filed an amended memorandum of law in support of their motion on February 11, 2009 (Doc. # 106).

## A. Plaintiff's Motion for Summary Judgment on Count I of the Amended Complaint—Breach of Contract

■ Count I of the Amended Complaint claims that SMC owes damages to SM Germany for breaching the 2005 Sales Agency Agreement executed between SMC and SM Germany. The 2005 Sales Agency Agreement is governed by Pennsylvania law. (2005 Sales Agency Agreement ¶ 26(b).) Pennsylvania law requires three elements to be proven to sustain a cause of action for breach of contract: (1) the existence of a contract, (2) a breach of a duty imposed by the contract, and (3) resultant damages. *Williams v. Nationwide Mut. Ins. Co.*, 750 A.2d 881, 884 (Pa.Super.2000) (citations omitted). To withstand summary judgment on a claim for breach of contract, the non-moving party must demonstrate the existence of a genuine issue of fact regarding those three elements. *Harry Miller Corp. v. Mancuso Chems. Ltd.*, 469 F.Supp.2d 303, 322 (E.D.Pa.2007) (Brody, J.). In this case there is no dispute as to the first element, the existence of a contract. Therefore, only the second (breach) and third elements (damages) will be addressed.

■ When interpreting a contract, the court must determine the intention of the parties. *Raiken v. Mellon*, 399 Pa.Super. 192, 582 A.2d 11, 13 (1990). When the words of a contract are "clear and unambiguous," the intent of the parties is derived from the express language of the agreement, and "the focus of interpretation is upon the terms of the agreement as *manifestly expressed*, rather than as, perhaps, silently intended." *Steuart v. McChesney*, 498 Pa. 45, 444 A.2d 659, 661 (1982) (emphasis in original). If the contract is ambiguous, courts may consider extrinsic evidence of the meaning intended. *Id.* at 663. However, the meaning of

language in a contract "cannot be distorted to establish the ambiguity." *Id.* The test for determining whether the contract language is ambiguous is whether it is "reasonably susceptible to being understood in more than one sense." *Id.*

SM Germany claims that SMC breached the agreement in three distinct ways: (1) by failing to pay the Current Indebtedness, (2) failing to hold payments in trust for SM Germany, and (3) failing to pay freight and installation charges, as required by the agreement. In its motion for summary judgment, SM Germany asks for summary judgment only on the claim that SMC breached the 2005 Sales Agency Agreement by failing to pay the Current Indebtedness (Am. Compl. ¶¶ 114–116). The Current Indebtedness that SM Germany claims it is owed is comprised of two individual debts: Q800,000 owed by SMC to SM Germany pursuant to a 2004 Loan Agreement (the "2004 Loan Debt"), and Q1,340,719.27 in an outstanding trade debt for products shipped by SM Germany prior to March 2005 (the "Trade Debt"). Because the terms of payment for each sum are distinct, I analyze each as a separate breach of contract claim. In each case I find that SMC has breached its obligation to pay the debt under the 2005 Sales Agency Agreement, and assess their damages.[21] I then address and reject the defendants' argument that any judgment rendered for the plaintiff should be awarded in Euros, not U.S. dollars.

### 1. The 2004 Loan Debt

As explained above, the 2005 Sales Agency Agreement requires SMC to acknowledge that it is indebted to SM Germany in the amount of Q800,000 (plus interest and expenses), pursuant to a 2004 Loan Agreement, executed on June 25,

---

**21.** SMC does not make any argument or submit any evidence that it has made any payments toward any part of the Current Indebtedness.

2004 (e.g., the 2004 Loan Debt). The 2004 Loan Agreement states that SMC shall repay the 2004 Loan Debt on or before December 31, 2005, at an interest rate of 3.5% per annum. SMC does not dispute SM Germany's claim that it has made no payments toward the 2004 Loan Debt, and is therefore in breach of its obligation under the 2005 Sales Agency Agreement to pay the 2004 Loan Debt. I therefore find the plaintiff is entitled to judgment and damages for failure to pay the 2004 Loan Debt.

■ With respect to damages, SM Germany argues that it should be awarded damages of Q800,000 plus interest at a rate of 3.5% from April 20, 2005 until December 31, 2005. In addition, SM Germany seeks prejudgment interest at a rate of 6% from December 31, 2005 to the date of judgment. The defendants do not object to the amount of contract damages, but object to the prejudgment interest calculation on the basis that: (1) that the 2004 Loan Agreement does not contemplate a default rate of interest other than 3.5%, and (2) that pre-judgment interest is discretionary and not warranted in this case.[22]

■ In Pennsylvania, it is "well established that in contract cases, prejudgment interest is awardable as of right." *Widmer Eng'g, Inc. v. Dufalla*, 837 A.2d 459, 469 (Pa.Super.2003) ("For over a century it has been the law of this Commonwealth that the right to interest upon money owing upon a contract is a legal right."). The premise underlying the award of prejudgment interest "centers upon the fact that the breaching party has deprived the injured party of using interest accrued on money which was rightfully due and owing to the injured party." *Somerset Cmty. Hosp. v. Allan B. Mitchell & Assocs., Inc.*, 454 Pa.Super. 188, 685 A.2d 141, 148 (1996). Interest is recoverable as contract damages:

(1) if the breach [of a contract] consists of a failure to pay a definite sum of money or to render a performance with fixed or ascertainable monetary value, interest is recoverable from the time for performance on the amount due less all deductions to which the party in breach is entitled.

(2) In any other case, such interest may be allowed as justice requires on the amount that would have been just compensation had it been paid when performance was due.

Restatement (Second) of Contracts § 354 (1979) (hereinafter, "Restatement Contracts"); *see also Penneys v. Penn. R.R. Co.*, 408 Pa. 276, 183 A.2d 544, 546 (1962) (adopting section 337 of the Restatement Contracts in determining when prejudgment interest is recoverable). The legal rate of interest in Pennsylvania is 6% per

---

**22.** The defendants also contend, in one paragraph of argument, that this Court lacks subject matter jurisdiction over this dispute because the 2004 Loan Agreement "specifically states that jurisdiction over disputes thereunder lies in Löhne, Germany." (Df.'s Resp. to Pl.'s Mot. for Summ. J. 7.) The defendants are incorrect. This Court clearly has subject matter jurisdiction over this diversity of citizenship action under 28 U.S.C. § 1332(a). Furthermore, the instant dispute arises under the 2005 Sales Agency Agreement, not the 2004 Loan Agreement; therefore, this Court's jurisdiction with respect to the 2004 Loan Agreement is not at issue. Reference to the 2004 Loan Agreement is required only to determine the amount of SM Germany's damages for SMC's breach of the 2005 Sales Agency Agreement. However, as the 2004 Loan Agreement is governed by German law (2004 Loan Agreement ¶ 7), to the extent that interpretation of the 2004 Loan Agreement is required, German law will be applied. The 2005 Sales Agency Agreement, on the other hand, is governed by Pennsylvania law, and Pennsylvania law shall be applied in its interpretation. (2005 Sales Agency Agreement ¶ 26.)

annum. 41 P.S. § 202; *see also Peterson v. Crown Fin. Corp.*, 661 F.2d 287, 292 (3d Cir.1981).

Prejudgment interest is recoverable in this case. The breach of contract involved SMC's failure to pay a definite sum by a definite date, and SMC has no available defenses to its failure to make payment. I find that SMC wrongfully withheld payment from SM Germany beginning December 31, 2005, and SM Germany is entitled to prejudgment interest from that date at a rate of 6% per annum.

### 2. The Trade Debt

The remaining balance of the Current Indebtedness owed to SM Germany under the 2005 Sales Agency Agreement is a balance in the amount of Q1,340,719.27 for orders previously shipped by SM Germany to SMC (e.g., the Trade Debt). As with the 2004 Loan Debt, it is undisputed that SMC has not made any payments toward the Trade Debt, and I find that SMC is in breach of the 2005 Sales Agency Agreement for failure to pay this debt.

■ In assessing prejudgment interest, SM Germany asks the Court to read the 2005 Sales Agency Agreement as requiring SMC to deliver payment of the Trade Debt by April 20, 2005, the date the agreement was executed, and to find SMC in breach of contract as of that date. However, the 2005 Sales Agency Agreement does not contain any definite terms that provide for repayment of the Trade Debt as of a certain date. The Court is not permitted to construe a contract "in such a manner as to write a new contract for the parties, but is confined to reasonable construction of the language as actually contained in the writing." *CBS Inc. v. Capital Cities Commc'ns, Inc.*, 301 Pa.Super. 557, 448 A.2d 48, 55 (1982).

■ Where parties to a valid contract have not agreed with respect to a term which is essential to a determination of their rights and duties under that agreement, the court will supply a term which is reasonable in the circumstances. *Reg-Scan, Inc. v. Con–Way Transp. Servs., Inc.*, 875 A.2d 332, 337 ("If an essential term is left out of the agreement, the law will not invalidate the contract but will include a reasonable term."). There is no question that the 2005 Sales Agreement is a valid agreement of which repayment of the Trade Debt is a material term. SMC acknowledged its obligation to pay the debt in the agreement, and waived all defenses to payment. (2005 Sales Agency Agreement, Recitals.) SMC's acknowledgment of this debt and waiver of defenses are consideration for SM Germany entering into the agreement. (2005 Sales Agency Agreement ¶ 17.)

Because the contract is silent as to the time of SMC's performance of its obligation to repay the Trade Debt, I must read into the contract a requirement of performance within a reasonable time. *Skehan v. Bd. of Trs. of Bloomsburg State College*, 431 F.Supp. 1379 (1977), *aff'd*, 590 F.2d 470 (3d Cir.1978); *see also Hodges v. Penn. Millers Mut. Ins. Co.*, 449 Pa.Super. 341, 673 A.2d 973, 974 (1996) (holding that when no time is specified for performance of a contractual obligation, the law implies that the obligation be performed within a "reasonable time."). A "reasonable time" is one which "comports with community standards of fairness and policy." Restatement Contracts § 204.

■ SMC ceased operations in June 2005. It is reasonable to expect that SMC would fulfill its payment obligations to SM Germany under the 2005 Sales Agency Agreement while SMC continued to act as SM Germany's sales agent and before the dissolution of the company. Therefore, I find that SMC breached the 2005 Sales Agency Agreement as of June 1, 2005, and has withheld payments from SM Germany

as of that date.[23] Because this breach of contract consists of a failure to render a performance having a fixed monetary value, SM Germany is entitled under Pennsylvania law to recover interest on the judgment (Q1,340,719.27), from June 1, 2005, to the date of judgment, at a rate of 6% per annum. *Peterson v. Crown Fin. Corp.*, 661 F.2d 287, 292 (3d Cir.1981).

### 3. Currency of Judgment

■ The defendants argue that because the Current Indebtedness under the 2005 Sales Agency Agreement was established in Euros, the parties had an expectation of measuring their respective rights and obligations in Euros, and therefore, any judgment entered against SMC should be entered in Euros, not in U.S. dollars ("USD"). The plaintiff requests that judgment be converted to USD.

United States courts "ordinarily give judgment on causes of action arising in another state, or denominated in a foreign currency, in United States Dollars, but they are not precluded from giving judgment in the currency in which the obligation is denominated or the loss was incurred." Restatement (Third) of Foreign Relations Law § 823 (1987) (hereinafter,

"Restatement Foreign Relations"); *see also ReliaStar Life Ins. Co. v. IOA Re, Inc.*, 303 F.3d 874, 883 (8th Cir.2002) ("[A]lthough the District Court was not compelled to make the award in U.S. dollars, it nevertheless was not error to do so."). The Restatement Foreign Relations cautions that judgment in a foreign currency should be issued "only when requested by the judgment creditor, and only when it would best accomplish the objectives of making the creditor whole and avoiding rewarding a debtor who has delayed in carrying out an obligation. Restatement Foreign Relations § 823 Comment (b). Here, the judgment creditor (SM Germany) has requested that the award be made in U.S. dollars, not Euros, and there is no evidence that a award in Euros would further the goals of making the creditor whole or avoiding unjust reward to the debtor. Therefore I am persuaded that the judgment entered for the plaintiff should be converted from Euros to USD.[24]

### B. Defendant's Motion for Summary Judgment on Count I of the Amended Complaint—Breach of Contract

■ SM Germany believes that it is owed approximately $51,060.45 in freight

---

**23.** SM Germany also argues that SM Germany made demands for payment on several occasions, but that SMC refused to make payment, and that prejudgment interest should be awarded from the earliest date of refusal. However, SM Germany has not submitted enough evidence to support its claim that it made demands to SMC for payment by a specific date. Ulrich Siekmann testified there were "discussions ... regarding payments after things would have settled down to SieMatic Germany against the Current Indebtedness" but admitted that he never made a demand for the money in a "written form." (Ulrich Siekmann Dep. 84:5–12; 86:3–10.) In Ulrich Siekmann's own words:

> It was a situation where the SieMatic Corporation was going down. We knew it was in a difficult situation at the time. There-

fore, it wouldn't have just made any sense to send out letters and letters that we did before and at the end of 2004 to get the money. We were talking on the phone every day almost in 2004, but now we're trying to handle the situation. Of course there was in the discussion that we had, we discussed how can we limit the amount of money that SieMatic Germany potentially would lose and how can we get the money back. Of course that was the case.

(Ulrich Siekmann Dep. 87:2–13.) This testimony does not persuade the court that Ulrich Siekmann demanded that SMC pay the Trade Debt by a date certain.

**24.** The parties shall be ordered to submit additional briefing on the calculation and conversion of the plaintiff's judgment in accordance with this ruling.

and installation expenses for which SMC was allegedly responsible under the 2005 Sales Agency Agreement. (Am. Compl. ¶¶ 118–121). SM Germany admits that there is no provision in the 2005 Sales Agency Agreement that requires SMC to pay such freight and installation charges, but argues that (1) the 2005 Sales Agency Agreement is ambiguous on its face as to who pays the freight company, and (2) that under the UCC the Court must also look at the prior course of dealing between the parties which demonstrates that SMC has always been responsible for the freight charges. (Ulrich Siekmann Dep. 113:12–17.) I disagree with the plaintiff on both counts.

The 2005 Sales Agency Agreement is not ambiguous: it clearly and unambiguously sets forth what SMC owes to SM Germany for SM Germany products sold by SMC. This amount specifically excepts packaging and shipping costs:

> SMC is responsible for ensuring payment to [SM Germany] of the Net Invoice Prices of [SM Germany] Products. "Net Invoice Price" shall mean [SM Germany]'s billing price less: (i) refunds, returns, commissions, *packaging, insurance . . . duty, shipping costs*, tax-

es, and allowances granted; (ii) any amount spent by [SM Germany] in connection with rendering technical services, training and field support services, and (iii) any account included on the invoice *for* [SM Germany]'s rendering the service described in this Agreement below.

(2005 Sales Agency Agreement ¶ 7) (emphasis added). SM Germany contends that, although it is not in the agreement, the past practice of the parties has always been that SMC paid for shipping costs, and the Pennsylvania Uniform Commercial Code ("PUCC") permits the Court to look at course of dealing evidence under these circumstances.[25]

The PUCC states that the terms set forth in a writing which are intended by the parties as a "final expression" of their agreement[26] "may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented: (1) by course of performance, course of dealing or usage of trade (section 1303); and by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement." 13 Pa.C.S.A. § 2202.[27]

---

25. The defendants do not argue that the PUCC does not apply to the 2005 Sales Agency Agreement. Therefore, for the purposes of this summary judgment motion I accept without further analysis plaintiff's claim that the 2005 Sales Agency Agreement is subject to the PUCC.

26. There is evidence that the 2005 Sales Agency Agreement was intended to be the final expression of the parties' agreement. The 2005 Sales Agency Agreement contains an explicit integration clause which states:
> This Agreement supersedes and cancels any previous agreements or understandings, whether oral, written or implied, heretofore in effect between [SM Germany] and SMC and sets forth the entire agreement between [SM Germany] and SMC.

(2005 Sales Agency Agreement ¶ 27.)

27. Section 2202 permits the following principles to be considered in construing agreements: (1) a writing which is final on some matters may not include all matters agreed upon; (2) the language used in a written agreement has the meaning which arises out of the commercial context in which it was used; (3) parol evidence may be considered even if the court has not determined that the language used in the written agreement is ambiguous and (4) the course of actual performance by the parties is the best indication of what they intended the writing to mean. *Getty Petroleum Mktg., Inc. v. Shipley Fuels Mktg., LLC,* No. 07–340, 2007 WL 2844872, at *16 (E.D.Pa. Sept. 27, 2007) (citing *Sundlun v. Shoemaker,* 421 Pa.Super. 353, 617 A.2d 1330, 1334 (1992)); 13 Pa.C.S.A. § 2202, Uniform Commercial Code Comment 1–2.

Even if the Court were permitted to looks at prior course of conduct dealing in this case, the plaintiff's evidence falls far short of defeating summary judgment. The sole evidence that the plaintiff presents to support its claim that SMC always paid for freight is the testimony of Ulrich Siekmann as to his own understanding that the 2005 Sales Agency Agreement entitled SM Germany to those charges. There is no evidence before the court to show that SMC ever actually made freight payments to SM Germany in the past. In order to defeat a motion for summary judgment, a plaintiff "must introduce more than a scintilla of evidence showing that there is a genuine issue for trial; she must introduce evidence from which a rational finder of fact could find in her favor." *Woloszyn v. County of Lawrence*, 396 F.3d 314, 319 (3d Cir.2005) (citations omitted). Ulrich Siekmann's own belief or understanding, without more, is not sufficiently probative to raise a genuine issue of material fact as to the prior course of dealing between the parties, and the contract language itself is clear that SMC is not responsible for shipping costs. Summary judgment for the defendants is granted on plaintiff's claim in Count I of the Amended Complaint that the defendants breached the 2005 Sales Agency Agreement by failing to pay freight and installation charges.

## C. Defendant's Motion for Summary Judgment on Counts II and III— Fraudulent Transfer

SM Germany alleges that SMC's transfer of the Showroom Assets, the Merit Receivable, the Hausscape Receivable, the Trademarks, and the Customer Trust Payments were made in violation of sections 5104 (Count II) and 5105 (Count III) of the Pennsylvania Uniform Fraudulent Transfer Act ("PUFTA"). 12 Pa.C.S.A. §§ 5104, 5105.

Section 5104 of PUFTA states that:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) with actual intent to hinder, delay or defraud any creditor of the debtor; or

(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(ii) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

12 Pa.C.S.A. § 5104. PUFTA Section 5105 similarly imposes liability for transfers of property meeting certain requirements that would support a finding of fraud:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

12 Pa.C.S.A. § 5105.

The defendants argue that they are entitled to summary judgment on Counts II and III because (1) the property that is the subject of the alleged fraudulent transfers is not an "asset" within SM Germany's reach under the PUFTA, (2) the transfers were made for reasonably equivalent val-

ue, and (3) there is no evidence that SMC acted with actual intent to hinder, delay, or defraud SM Germany. I find that genuine issues of material fact exist which defeat defendants' motion for summary judgment.

### 1. Encumbrance of the Assets

A transfer is defined under PUFTA as "[e]very mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset." 12 Pa.C.S.A. § 5101(b). An "asset" is defined as the "property of a debtor," but specifically excludes "property to the extent that it is encumbered by a valid lien." *Id.*; *see also* 12 Pa.C.S.A. § 5101 Comment 2 (explaining that the statutory definition of an "asset" excludes "an interest that is generally beyond reach by unsecured creditors because subject to a valid lien"). "Property" is defined under the UCC as "[a]nything that may be the subject of ownership." *Id.* The Comments to the definition section of PUFTA further explain the "to the extent it is encumbered" language in the definition of "asset" by giving the following example:

> [I]in the case of property encumbered by a lien securing a contingent obligation, such as a guaranty, in general it would be appropriate to value the obligation by discounting its face amount to reflect the probability that the guaranty will ever be called upon. Likewise, if an obligation is secured by a lien on several items of property and only one such item is disposed of, it may be appropriate to allocate the obligation among the items of property subject to the lien for the purpose of determining the "extent" to which the item disposed of is encumbered for purposes of this definition.

12 Pa.C.S.A. § 5101 Comment. Thus, where the lien is a contingent obligation, such as a guaranty, the obligation is valued in light of the probability that the guaranty will ever be called upon. A "valid lien" is a "lien that is effective against the holder of a judicial lien subsequently obtained by legal or equitable processor proceedings." 12 Pa.C.S.A. § 5101. The term "lien" includes "a security interest created by agreement ... or a statutory lien." 12 Pa.C.S.A. § 5101(b).

Thus, under PUFTA "there is no transfer subject to possible avoidance where the 'asset' 'transferred' is encumbered by a valid prior lien." *In re Blatstein*, 226 B.R. 140, 154 (E.D.Pa.1998). In other words, a transfer is fraudulent only if the debtor disposes of property that the creditor would have a legal right to look for in satisfaction of his claim.

The defendants contend that all of the Transfers were encumbered by liens held by other entities and thus were not "assets" within SM Germany's reach under the PUFTA. In support, the defendants produce evidence that as of June 10, 2002, the Bank of Novia Scotia ("Scotia Bank") held a perfected security interest in all accounts of SMC (Dfs.' Mot. for Summ. J. Ex. 7, UCC–1 Financing Statement); as of November 9, 2004, Montcap Financial Corporation ("Montcap") held a perfected security interest in all of SMC's tangible and intangible personal property (Dfs.' Mot. for Summ. J. Ex. 10, UCC–1 Financing Statement); and as of December 14, 2005, HSBC Bank Canada ("HSBC") held a perfected security interest in the Merit Receivable (Dfs.' Mot. for Summ. J. Exs. 11, 12, UCC–1 Financing Statements). With respect to the Customer Trust Payments, SMC argues that this property does not qualify as an "asset" because it was always property that belonged to SM Germany and was merely being held "in trust" by SMC.

SM Germany raises a genuine issue of material fact by pointing out that each of the agreements governing the Transfers contains clear and unambiguous language

stating that the assets were being transferred "free and clear of any mortgage, pledge, security interest, lien, restriction on use or transfer, any conditional sale or other title retention agreement, or any lease in the nature thereof." (*See* Pl.'s Resp. to Dfs.' Mot. for Summ. J. Exs. V, X–Z, AA ¶ 3.) This clear and unambiguous contract language is in apparent conflict with the existence of a valid lien on those assets. Furthermore, plaintiff argues, if there were valid liens encumbering the transferred property, there is no evidence that the lien holders acted to prevent Frank Siekmann from transferring the allegedly encumbered property to himself at the time of the Transfers.[28] Thus, the plaintiff argues that the alleged liens are, at best, contingent obligations that are unlikely to be called upon by, and for that reason they are not out of the reach of creditors.

The determination of the validity, priority and scope of the alleged liens in the assets of SMC is crucial to this dispute. Given that SMC transferred assets notwithstanding the alleged encumbrances, I find that there is a genuine issue of material fact as to whether or not the transferred assets were in fact, encumbered by a "valid lien" within the meaning of the PUFTA.

With respect to the Customer Payments, SMC argues that these payments were never "property of the debtor" within the scope of PUFTA because they were always property of SM Germany only being held in trust by SMC. However, whether the Customer Payments were actually held in trust by SMC is a matter of proof as to which there is a issue of material fact. SM

Germany has produced some evidence that these funds were not held in trust at all, but were in fact commingled with SMC's own assets and subsequently transferred to SDS in violation of the 2005 Sales Agency Agreement. (Frank Siekmann Dep. 188:18–189:5; 189:6–17; 204:7–13.)

### 2. Reasonably Equivalent Value

▇▇▇▇ To defeat a claim of fraudulent transfer, PUFTA requires defendants to show by clear and convincing evidence *either* that SMC was solvent at the time the allegedly fraudulent transfers were made, *or* that reasonably equivalent value was given for the transfers (emphasis added). *In re Blatstein*, 192 F.3d 88, 98 (3d Cir. 1999). The defendants do not argue that SMC was solvent at the time of the transfers, only that the transfers were made for reasonably equivalent value. The plaintiff contends that there is a genuine issue of fact as to whether the Transfers were made for reasonably equivalent value because (1) there is evidence that as of February 22, 2005, SMC had not received the benefit of its bargain with respect to the transfers, and (2) the loans that Frank Siekmann made to SMC were sometimes treated as loans and at other times treated as equity on SMC's balance sheet.[29]

The transfers at issue (the Showcase Assets, the Merit Receivable, the Hausscape Receivable and the Trademarks) were each made pursuant to a separate agreement between SMC and Frank Siekmann by which SMC agreed to reduce Frank Siekmann's aggregate shareholder loan balance of $3.85 million by the purchase price of the asset. The agreements are all dated either December 31, 2004, or

---

**28.** The earliest evidence the defendants have produced that any lien holder acted to collect on its lien is dated April 26, 2005. (Pl.s' Resp. to Defs.' Mot. for Summ. J. Ex. BB, Letter from Bank of Nova Scotia solicitors, dated April 26, 2005.)

**29.** Because I find that a genuine issue of material fact exists with respect to reasonably equivalent value, I do not reach this argument at this time.

January 1, 2005. The Transfers were valued by the plaintiff's expert at approximately $1,398,518.86.[30] (See Report of J. Mitchell at 10.) As the amount of Frank Siekmann's shareholder loan balance ($3.8 million) vastly exceeds the value of the assets SMC transferred to him ($1.4 million), the defendants argue that this exchange clearly represents reasonably equivalent value.[31]

However, SM Germany presents evidence which raises questions as to whether reasonably equivalent value was in fact received for the transfers. First, the plaintiff cites an email dated February 22, 2005, sent from Frank Siekmann to Ulrich Siekmann, in which Frank Siekmann proposes, as part of an offer to sell SMC to SM Germany, that Frank Siekmann "write off my loans outstanding from SieMatic Corporation (USD $3.85 million less purchase value of Design Centers)." (Pl.'s Resp. to Dfs.' Mot. for Summ. J. Ex. L.) The implication of this email, SM Germany argues, is that as of February 22, 2005, SMC had not received any value for the Transfers, because if it had, Frank Siekmann's notation about the outstanding loan balance would have reflected Frank Siekmann's reduced shareholder loan balance.[32] The defendants respond that this email cannot be taken as evidence of anything except Frank Siekmann's efforts to negotiate a favorable exit strategy with SM Germany. The import of this email should be derived by the trier of fact. Furthermore, the defendants have not produced clear and convincing evidence that SMC re-

ceived actual value for the Transfers at any time prior to, or after, February 22, 2005. In fact, SMC's April 30, 2005 balance sheet continues to list Frank Siekmann's "loan from shareholder" as equity of $3.85 million. This discrepancy raises a genuine issue of material fact as to whether reasonably equivalent value was ever received for the Transfers.

### 3. Intent to Hinder, Delay, or Defraud

■ The plaintiff bears the burden of establishing that the alleged fraudulent transfers were made by SMC with actual intent to hinder, delay, or defraud creditors. The defendants maintain the SM Germany has "uncovered no evidence to suggest that Frank Siekmann had a vague intent, let alone 'actual intent,' to hinder, delay or defraud any creditor." (Dfs.' Mot. for Summ. J. 27.) The PUFTA provides a non-exclusive list of factors that should be considered in determining actual intent under state law. 12 Pa.C.S.A. § 5104(b). These so-called "badges of fraud" include:

(1) the transfer or obligation was to an insider;

(2) the debtor retained possession or control of the property transferred after the transfer;

(3) the transfer or obligation was disclosed or concealed;

(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

---

**30.** This figure assumes that the value of the Showroom Assets is $660,000.00 instead of the $310,000.00 actually realized from the sale of the Showroom Assets. If the $310,000.00 figure is used, the estimated value of the property is $1,048,518.86.

**31.** Defendants further argue that these transfers, valued at $1.4 million, would represent reasonably equivalent value even if the Court

were to ignore the $2,000,000 in undocumented shareholder loans and only consider the one documented shareholder loan Frank Siekmann made to SMC in 1999 for $1.8 million. (Dfs.' Mot. for Summ. J. 27.)

**32.** The plaintiff further suggests that this email is evidence that the Transfers were backdated.

(5) the transfer was of substantially all the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

12 Pa.C.S.A. § 5104(b). Not all badges of fraud need to be established to prove fraudulent intent. *In re Penn. Gear Corp.*, Bankr. No. 02–36436, 2008 WL 2370169, at *10 (E.D.Pa. Apr. 22, 2008). The plaintiff has presented evidence with respect to several badges of fraud, including the debtor's insolvency at or shortly after the transaction,[33] the transfer having been made to an insider, the transfer being made for less than reasonably equivalent value, and the timing of the transfers as evidence that they were made with the intent to hinder, delay, or defraud SM Germany. The plaintiff has presented sufficient evidence of actual intent to overcome defendants' motion for summary judgment. The defendants' motion for summary judgment on Counts II and III of the Amended Complaint alleging fraudulent transfer is denied.

## D. Defendants' Motion for Summary Judgement on Count IV—Piercing the Corporate Veil

■ In Count IV of the Amended Complaint, SM Germany asks the court to pierce the corporate veil and hold Frank Siekmann personally liable for any damages assessed against SMC. Piercing the corporate veil is not an independent cause of action, but is an equitable remedy that may be imposed by the court to "redress[ ] a wrong by the expedient of ignoring the legal fiction that a corporation's existence is separate from that of its owner." *Cantiere DiPortovenere Piesse v. Kerwin*, 739 F.Supp. 231, 236 (E.D.Pa.1990).

■ The general rule in Pennsylvania is that a corporation is regarded as an entity distinct from its shareholders, even if its stock is held entirely by one person. *See Lumax Indus., Inc. v. Aultman*, 543 Pa. 38, 669 A.2d 893, 895 (1995).[34] Piercing the corporate veil is reserved for circumstances where equity demands that the corporate form be disregarded, such as to "prevent fraud, illegality, or injustice, or when recognition of the corporate entity would defeat public policy or shield someone from liability for a crime." *Pearson v. Component Technology Corp.*, 247 F.3d 471 (3d Cir.2001) (quoting *Zubik v. Zubik*, 384 F.2d 267, 272 (3d Cir.1967)); *see also E–Time Sys., Inc. v. Voicestream Wireless Corp.*, No. 01–5754, 2002 WL 1917697, at *11 (E.D.Pa. Aug. 19, 2002) (quoting *Pearson* and *Zubik* in discussing standard for veil-piercing under Pennsylvania law). This is a "stringent inquiry" and courts deciding whether to disregard the corporate entity must "start from the general rule that the corporate entity should be

---

**33.** As discussed, *supra,* the defendants have not argued that SMC was solvent as of the date of the Transfers, and this point is resolved in favor of plaintiff for the purpose of this summary judgment motion.

**34.** There is no dispute that Pennsylvania law applies.

recognized and upheld, unless specific, unusual circumstances call for an exception." *Official Committee of Unsecured Creditors v. R.F. Lafferty & Co., Inc.*, 267 F.3d 340, 353 (3d Cir.2001).

■■■■ Factors to be considered in piercing the corporate veil include: (1) gross undercapitalization, (2) failure to observe corporate formalities, (3) substantial mingling of corporate and personal affairs, and (4) using the corporate form to perpetrate a fraud. *Nowicki v. United Timber Corp.*, No. 99–257, 2000 WL 1239966, at * 5 (E.D.Pa. Aug. 31, 2000); *Lumax Industries*, 669 A.2d at 895; *see also Village at Camelback v. Carr*, 371 Pa.Super. 452, 538 A.2d 528, 533 (1988) ("Thus, we inquire, *inter alia*, whether corporate formalities have been observed and corporate records kept, whether officers and directors other than the dominant shareholder himself actually function, and whether the dominant shareholder has used the assets of the corporation as if they were his own."). These factors are not exhaustive, nor is every element required for a finding of liability; however, the situation must present "an element of injustice or fundamental unfairness." *Trustees, Nat. Elevator Indus. Pension v. Lutyk*, 332 F.3d 188, 194 (3d Cir.2003). The party seeking to pierce the corporate veil must carry its burden of proof by providing clear and convincing evidence in favor of piercing the corporate veil. *Id.* There is a strong presumption against piercing the corporate veil in Pennsylvania. *Lumax Industries*, 669 A.2d at 895.

■■■■ The defendants argue that the plaintiff's evidence does not meet the strict evidentiary standard for veil piercing as a matter of law.[35] It is the function of the court to determine whether there is sufficient evidence for a claim to reach the trier of fact. *Elwell v. PP & L, Inc.*, 47 Fed. Appx. 183, 188 (3d Cir.2002). I find that the plaintiff has presented clear and convincing evidence of several factors that weigh in favor of veil piercing, including disregarding corporate formalities, repaying shareholder loans at a time when SMC was presumptively insolvent, and siphoning assets. I also find that the circumstances presented contain an element of injustice. Thus the plaintiff has succeeded in presenting evidence such that a reasonable jury could return a verdict for the plaintiff on its claim for piercing the corporate veil. *See e.g., Lutyk*, 332 F.3d at 198 (finding sufficient ground to pierce the corporate veil where the corporate was grossly undercapitalized, funds were siphoned to the sole shareholder at a time of financial distress by means of repayment of substantial shareholder loans, corporate record keeping and procedures were inadequate, and there was an element of injustice); *United States v. Pisani*, 646 F.2d 83, 88 (3d Cir.1981) (finding element of unfairness where sole shareholder "loaned large sums to the corporation and then repaid the loans to himself with corporate funds

---

**35.** The defendants attempt to defeat plaintiff's veil piercing claim by pointing out that SMC has been a going concern for over 15 years and could not possibly be found to be a sham corporation. The fact that, when founded, SMC was a legitimately functioning corporation does not preclude a finding that Frank Siekmann abused the corporate form as the company was spiraling into insolvency. As the Third Circuit noted in affirming the district court's decision to pierce the corporate veil in *Lutyk*, "although Lutyk may have initially founded American as a bona fide corporation for conducting elevator work, his conduct in the management of that company, particularly over the final years of the company's operation, is clear and convincing evidence of sufficient abuse of the corporate form for his personal benefit so as to justify the equitable remedy of piercing the corporate veil." *Lutyk*, 332 F.3d at 199 (affirming *Trustees, Nat. Elevator Industry Pension v. Lutyk*, 140 F.Supp.2d 447, 457 (E.D.Pa.2001)).

while the corporate was failing."). The plaintiff has also presented evidence that raises genuine issues of material fact with respect to additional claims relevant to the veil piercing analysis, such as whether SMC was subsequently undercapitalized, or whether the Transfers were made at a time when SMC's demise was inevitable. The defendants' motion for summary judgment on Count IV, piercing the corporate veil, is therefore denied.

### IV. *Conclusion*

The plaintiff's motion for partial summary judgment on Count I of the complaint for breach of contract is granted and judgment shall enter for the plaintiff in an amount to be determined after further briefing on damages. The defendants' motion for partial summary judgment on Count I of the complaint for breach of contract for failure to pay freight and installation charges is also granted. With respect to Counts II, III, and IV, for fraudulent transfer and piercing the corporate veil, the defendants' motion for summary judgment is denied.

### *ORDER*

**AND NOW,** this *15th* day of July, 2009, upon consideration of the Partial Motion for Summary Judgment of Plaintiff on Count I of the Amended Complaint (Doc. # 102), and the response of the Defendant SieMatic Corporation thereto, it is **OR-DERED** that Plaintiff's Motion is **GRANTED** as to Count I of the Amended Complaint, breach of contract for failure to pay the Current Indebtedness (Am. Compl. ¶¶ 114–116).

It is further **ORDERED** that the plaintiff shall submit a proposed formula for the calculation and conversion of damages and prejudgment interest for SMC's breach of contract (the "Proposed Formula"). The Proposed Formula should reflect the Court's ruling that the plaintiff is entitled to:

(a) Q800,000 plus interest at a rate of 3.5% from April 20, 2005 until December 31, 2005, converted into U.S. Dollars, plus prejudgment interest on that amount at a rate of 6% from December 31, 2005; and

(b) Q1,340,719.27, plus prejudgment interest on that amount at a rate of 6% from June 1, 2005.

The plaintiff shall submit the Proposed Formula by August 3, 2009. The defendant shall submit its opposition to the Proposed Formula, if any, by August 17, 2009. Judgment shall be entered for the plaintiff in an amount to be determined following review of the Proposed Formula and any response thereto.

It is further **ORDERED** that the Motion for Summary Judgment of Defendant SieMatic Corporation (Doc. # 101), is **GRANTED** in part and **DENIED** in part as follows:

Defendants' Motion for Summary Judgment on Count I, breach of contract for failure to pay freight and installation charges (Am. Compl. ¶¶ 118–12 1), is **GRANTED** and this claim is dismissed;

Defendants' Motion for Summary Judgment on Count II, Fraudulent Transfer under Pa.C.S.A. § 5104, is **DENIED;**

Defendants' Motion for Summary Judgment on Count III, Fraudulent Transfer under Pa.C.S.A. § 5105, is **DENIED;**

Defendants' Motion for Summary Judgment on Count IV, Piercing the Corporate Veil, is **DENIED.**